918 F.2d 763
 59 USLW 2317
 Yolanda GARZA; Salvador Ledezma; Raymond Palacios; Monica
Tovar, Guadalupe De La Garza, Plaintiffs-Appellees,
v.
COUNTY OF LOS ANGELES, Board of Supervisors, Los Angeles
County; Deane Dana; Peter F. Schabarum; Kenneth
F. Hahn, Defendants-Appellants.
UNITED STATES Of America, Plaintiff-Appellee,
and
Lawrence K. Irvin; Sarah Flores, Intervenors-Appellees,
v.
COUNTY OF LOS ANGELES, Board of Supervisors, Los Angeles
County; Deane Dana; Peter F. Schabarum; Kenneth
F. Hahn, et al., Defendants-Appellants.
 Nos. 90-55944, 90-55945 and 90-56024.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 10, 1990.
Decided Nov. 2, 1990.
Certiorari Denied Jan. 7, 1991.
See 111 S.Ct. 681.
 
 John E. McDermott, Los Angeles, Cal., for defendants-appellants Los Angeles County.
 Thomas K. Bourke, Los Angeles, Cal., for appellant Flores.
 Mark D. Rosenbaum, Richard P. Fajardo, Antonia Hernandez, Los Angeles, Cal., for plaintiffs-appellees Garza.
 Irving Gornstein and Jessica Dunsay Silver, Steven H. Rosenbaum, Mark L. Gross and Miriam R. Eisenstein, Dept. of Justice, Washington, D.C., for plaintiff-appellee U.S.
 Theodore Shaw, Los Angeles, Cal., for intervenor-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before SCHROEDER, NELSON, and KOZINSKI, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 INTRODUCTION
 
 1
 Hispanics in Los Angeles County, joined by the United States of America, filed this voting rights action in 1988 seeking a redrawing of the districts for the Los Angeles County Board of Supervisors. They alleged that the existing boundaries, which had been drawn after the 1980 census, were gerrymandered boundaries that diluted Hispanic voting strength. They sought redistricting in order to create a district with a Hispanic majority for the 1990 Board of Supervisors election in which two board members were to be elected.
 
 
 2
 The Voting Rights Act, 42 U.S.C. Sec. 1973, forbids the imposition or application of any practice that would deny or abridge, on grounds of race or color, the right of any citizen to vote. In 1980, a plurality of the Supreme Court held that this provision prohibited only intentional discrimination, and would not allow minorities to challenge practices that, although not instituted with invidious intent, diluted minority votes in practice. City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). In response to this decision, Congress amended the Voting Rights Act in 1982 to add language indicating that the Act forbids not only intentional discrimination, but also any practice shown to have a disparate impact on minority voting strength. See 42 U.S.C. Sec. 1973(b). Thus, after the 1982 amendment, the Voting Rights Act can be violated by both intentional discrimination in the drawing of district lines and facially neutral apportionment schemes that have the effect of diluting minority votes.
 
 
 3
 To the extent that a redistricting plan deliberately minimizes minority political power, it may violate both the Voting Rights Act and the Equal Protection Clause of the fourteenth amendment. See Bolden, 446 U.S. at 66-67, 100 S.Ct. at 1499. The plaintiffs in this case claimed that because the County had engaged in intentional discrimination in the drawing of district lines in 1981, the resulting boundaries violated both the Voting Rights Act and the Equal Protection Clause. They further claimed that, whether or not the vote dilution was intentional, the effect of the County's districting plan was the reduction of Hispanic electoral power in violation of the newly amended Voting Rights Act.
 
 
 4
 The district court held a three-month bench trial. At its conclusion the district court found that the County had engaged in intentional discrimination in the 1981 reapportionment, as it had in prior reapportionments, deliberately diluting the strength of the Hispanic vote. It also found that, regardless of intentional discrimination, the County's reapportionment plan violated the Voting Rights Act because it had the effect of diluting Hispanic voting strength. Finally, it found that, based on post-census data, it was possible to grant the remedy that the plaintiffs sought, which was a redistricting in which one of the five districts would have a Hispanic voting majority. It ordered the County to propose such a redistricting.
 
 
 5
 In its findings, the district court detailed the recent history of the Los Angeles County Board of Supervisors and the voting procedures by which it has been elected. At least since the beginning of this century, the Board has always consisted of five members, elected in even-numbered years to serve four-year terms. These elections are staggered so that two supervisors are elected one year, and three are elected two years later. Supervisors are elected in non-partisan elections, and a candidate must receive a majority of the votes cast in order to win. If no candidate receives such a majority, the two candidates who receive the highest number of votes must engage in a runoff contest.
 
 
 6
 The district court found persuasive the evidence showing that the Board had engaged in intentional discrimination in redistrictings that it undertook in 1959, 1965 and 1971. The district court further found that the 1981 redistricting was calculated at least in part to keep the effects of those prior discriminatory reapportionments in place, as well as to prevent Hispanics from attaining a majority in any district in the future. The findings of the district court on the question of intentional discrimination are set forth in the margin.[1] After entering these findings and conclusions of law, the district court gave the County the opportunity to propose a new plan, as required by Wise v. Lipscomb, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978).
 
 
 7
 Under the Los Angeles County Charter, any redistricting must be approved by four of the five members of the Board. In response to the court's order directing the County to propose a plan, three Board members submitted a proposal. The district court rejected that proposal with findings to support its conclusion that the proposal was less than a good faith effort to remedy the violations found in the existing districting. The court considered other proposals. On August 6 it accepted and imposed a plan which creates a district in which the majority of the voting age citizen population is Hispanic. The County then appealed and this court ordered the matter handled on an expedited basis.
 
 
 8
 There is a second appeal before us. It is from the district court's denial of a motion to intervene in the main case. During the course of the proceedings, there was a primary election under the existing districting plan. The incumbent supervisor, Edmund Edelman, received a majority of the votes in District 3, and thereby won that seat. In the District 1 contest, the incumbent did not seek reelection. No candidate received the required majority of the votes; therefore, the two front runners, Sarah Flores and Gregory O'Brien, were scheduled to compete in a runoff election on November 6, 1990.
 
 
 9
 During the remedial phase of these proceedings, one of those candidates, Sarah Flores, sought to intervene in this action in order to oppose any redistricting plan which would result in the need for a new primary election in which additional candidates could run for the seat she was seeking in District 1. The district court denied her petition to intervene and she appeals from that denial. We have jurisdiction of her appeal pursuant to 28 U.S.C. Sec. 1291. See California v. Block, 690 F.2d 753, 776 (9th Cir.1982) (denial of motion to intervene is an appealable order).
 
 I. The County Appeal--Liability
 
 10
 Plaintiffs filed this action in order to require the imposition of new district lines for the 1990 election of supervisors. The record shows without serious dispute that at the time of the decennial redistricting in 1981, it was not possible to draw a district map, with roughly equal population in each district, that contained a district with a majority of Hispanic voters. The district court found, however, that the County in 1981, as part of a course of conduct that began decades earlier, intentionally fragmented the Hispanic population among the various districts in order to dilute the effect of the Hispanic vote in future elections and preserve incumbencies of the Anglo members of the Board of Supervisors. The evidence in the record also shows that at the time that this action was filed it was possible to draw lines for five districts of roughly equal population size, as required by state law, with one single-member district having a majority of Hispanic voters.
 
 
 11
 The district court found the County liable for vote dilution on two separate theories. It found that the County had adopted and applied a redistricting plan that resulted in dilution of Hispanic voting power in violation of Section 2. It also found that the County, by establishing and maintaining the plan, had intentionally discriminated against Hispanics in violation of Section 2 and the Equal Protection clause of the fourteenth amendment.
 
 
 12
 In this appeal, the County's threshold argument is that districts drawn in 1981 are lawful, regardless of any intentional or unintentional dilution of minority voting strength, because at the time they were drawn there could be no single-member district with a majority of minority voters. The County asks us to extract from the Supreme Court's leading decision in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), and subsequent cases in this and other circuits, the principle that there can be no successful challenge to a districting system unless the minority challenging that system can show that it could, at the time of districting, constitute a voter majority in a single-member district.
 
 
 13
 In response to this position, the appellees argue that no majority requirement should be imposed where, as here, there has been intentional dilution of minority voting strength. The County thus also challenges the sufficiency of the district court's findings with regard to intent.
 
 
 14
 We hold that, to the extent that Gingles does require a majority showing, it does so only in a case where there has been no proof of intentional dilution of minority voting strength. We affirm the district court on the basis of its holding that the County engaged in intentional discrimination at the time the challenged districts were drawn.
 
 A. The Background and Effect of Gingles
 
 15
 In 1982, Congress amended Section 2 of the Voting Rights Act, 42 U.S.C. Sec. 1973, to provide minority groups a remedy for vote dilution without requiring a showing that the majority engaged in intentional discrimination. Congress set forth a non-exhaustive list of factors to guide courts in determining whether there had been a Section 2 violation. S.Rep. No. 417, 97th Cong., 2d Sess., pt. I at 28-29, U.S.Code Cong. & Admin.News 1982, pp. 206-207. Congress indicated that in applying these factors, courts should engage in a "searching practical evaluation of the 'past and present reality' " of the political system in question. Id. at 30, U.S.Code Cong. & Admin.News 1982, p. 208. Creation of this "results" test for discrimination under Section 2 did not affect the remedies under Section 2 for intentional discrimination. Id. at 27.
 
 
 16
 In Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court discussed the meaning of the new amendment. While noting the factors the Senate had set out as indicators of impermissible vote dilution, it stated that a court must look to the totality of the circumstances in considering a vote dilution claim. It also established three preconditions for liability under the amendment to Section 2 for claims based only on discriminatory effects: (1) geographical compactness of the minority group; (2) minority political cohesion; and (3) majority block voting. 478 U.S. at 50-51, 106 S.Ct. at 2766-67.
 
 
 17
 The Gingles requirements were articulated in a much different context than this case presents. Although the Gingles Court was aware of the history of discrimination against blacks, which was the minority there in question, the Court did not consider any claim that the disputed districting plan had been enacted deliberately to dilute the black vote. See 478 U.S. at 80, 106 S.Ct. at 2760-61. The claim at issue was that the multi-member districts that were being used, regardless of the intent with which they were created, had the effect of diluting the black vote. 478 U.S. at 39-41, 106 S.Ct. at 2781-82. Thus, the court instituted the "possibility of majority" requirement in a case in which it was asked to invalidate a political entity's choice of a multi-member district system, and impose a system of single-member districts, and was not asked to find that the multi-member scheme had been set up with a discriminatory purpose in mind.[2] An emphasis on showing a statistically significant disparate impact is typical of claims based on discriminatory effect as opposed to discriminatory intent.
 
 
 18
 In contrast, the district court in this case found that the County had adopted its current reapportionment plan at least in part with the intent to fragment the Hispanic population. See Findings at 44 No. 81. The court noted that continued fragmentation of the Hispanic population had been at least one goal of each redistricting since 1959. Thus, the plaintiffs' claim is not, as in Gingles, merely one alleging disparate impact of a seemingly neutral electoral scheme. Rather, it is one in which the plaintiffs have made out a claim of intentional dilution of their voting strength.
 
 
 19
 The County cites a number of cases in support of its argument that Gingles requires these plaintiffs to demonstrate that they could have constituted a majority in a single-member district as of 1981. None dealt with evidence of intentional discrimination. See, e.g., Romero v. City of Pomona, 883 F.2d 1418, 1422 (9th Cir.1989); McNeil v. Springfield Park, 851 F.2d 937 (7th Cir.1988), cert. denied, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989); Skorepa v. City of Chula Vista, 723 F.Supp. 1384 (S.D.Cal.1989).
 
 
 20
 To impose the requirement the County urges would prevent any redress for districting which was deliberately designed to prevent minorities from electing representatives in future elections governed by that districting. This appears to us to be a result wholly contrary to Congress' intent in enacting Section 2 of the Voting Rights Act and contrary to the equal protection principles embodied in the fourteenth amendment.
 
 B. The Findings of Intent
 
 21
 We therefore turn to the appellants' challenge to the district court's rulings with respect to the intent of the supervisors in 1981. The County contends that the district court did not make sufficient findings on intentional discrimination. Focusing on language in Finding 177, quoted supra in note 1, the County claims that the district court found only that the supervisors in 1981 intended to perpetuate their own incumbencies. This is a mistaken reading of what the district court found. Although the court noted that "the Supervisors appear to have acted primarily on the political instinct of self-preservation," the court also found that they chose fragmentation of the Hispanic voting population as the avenue by which to achieve this self-preservation. Finding No. 181. The supervisors intended to create the very discriminatory result that occurred. That intent was coupled with the intent to preserve incumbencies, but the discrimination need not be the sole goal in order to be unlawful. See Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Accordingly, the findings of the district court are adequate to support its conclusion of intentional discrimination, and the detailed factual findings are more than amply supported by evidence in the record.
 
 
 22
 Even where there has been a showing of intentional discrimination, plaintiffs must show that they have been injured as a result. Although the showing of injury in cases involving discriminatory intent need not be as rigorous as in effects cases, some showing of injury must be made to assure that the district court can impose a meaningful remedy.
 
 
 23
 That intent must result, according to the Voting Rights Act, in the
 
 
 24
 political processes leading to nomination or election ... [not being] equally open to participation by members of a [protected] class ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.
 
 
 25
 42 U.S.C. Sec. 1973(b). This language is echoed in the intentional discrimination case of White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). There, in addition to intent, the Supreme Court required proof that "the political processes leading to nomination and election were not equally open to participation by the group in question--that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." Id. at 766, 93 S.Ct. at 2339. See also Whitcomb v. Chavis, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971).
 
 
 26
 Applying that standard to this case of intentional discrimination, we agree with the district court that the supervisors' intentional splitting of the Hispanic core resulted in a situation in which Hispanics had less opportunity than did other county residents to participate in the political process and to elect legislators of their choice. We conclude, therefore, that this intentional discrimination violated both the Voting Rights Act and the Equal Protection Clause.C. Laches
 
 
 27
 The County claims that, because four rounds of elections have occurred since the 1981 reapportionment plan was instituted, and because a regular reapportionment is scheduled to occur in 1991, the plaintiffs' claim for redistricting relief is barred on the ground of laches. It argues that substantial hardship will result from a redistricting now, when another regularly scheduled one is set to occur so closely on its heels. Furthermore, the County contends that the plaintiffs had no excuse for their delay in bringing suit. Therefore, it concludes, the suit should have been dismissed.
 
 
 28
 Although plaintiffs could have filed an action as early as 1981 in order to enhance their ability to influence the result in a district in which they were then still a minority, their failure to do so does not constitute laches. The record here shows that the injury they suffered at that time has been getting progressively worse, because each election has deprived Hispanics of more and more of the power accumulated through increased population. Because of the ongoing nature of the violation, plaintiffs' present claim ought not be barred by laches.
 
 II. The County Appeal--Remedy
 
 29
 A. Redistricting Between Decennial Redistrictings
 
 
 30
 The County contends that the district court erred in requiring it to redistrict now, at a point between regularly scheduled decennial reapportionments. Citing Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, reh'g denied, 379 U.S. 870, 85 S.Ct. 12, 13 L.Ed.2d 76 (1964), the County claims that decennial redistricting based upon census data is a "rule," and that that case "was intended to avoid" the confusion that might be associated with more frequent reapportionments.
 
 
 31
 The County misreads Reynolds. The Court in Reynolds instituted a requirement of periodic reapportionment based upon current population data. It stated that decennial reapportionment "would clearly meet the minimal requirements," and less frequent reapportionment would "assuredly be constitutionally suspect." 377 U.S. at 583-84, 84 S.Ct. at 1393. The Court further noted, however, that while more frequent apportionment was not constitutionally required, it would be "constitutionally permissible," and even "practicably desirable." Id. Thus, Reynolds did not institute a constitutional maximum frequency for reapportionment; rather, it set a floor below which such frequency may not constitutionally fall.
 
 B. Use of Post-1980 Population Data
 
 32
 The County further claims that the district court erred in considering any data other than data from the 1980 census. Since the 1980 census data does not suggest the possibility of creating a Hispanic majority district, the County claims that the plaintiffs must lose in their 1988 claim to redistrict to provide for such a district. This claim, too, misinterprets the case law on which it purports to rest.
 
 
 33
 Since Reynolds would permit redistricting between censuses, it appears to assume that post-census data may be used as a basis for such redistricting. Furthermore, in a subsequent opinion the Court noted with approval the possibility of using predictive data in addition to census data in designing decennial reapportionment plans. The court stated that "[s]ituations may arise where substantial population shifts over such a period [the ten years between redistricting] can be anticipated. Where these shifts can be predicted with a high degree of accuracy, States that are redistricting may properly consider them." Kirkpatrick v. Preisler, 394 U.S. 526, 535, 89 S.Ct. 1225, 1231, 22 L.Ed.2d 519, reh'g denied, 395 U.S. 917, 89 S.Ct. 1737, 23 L.Ed.2d 231 (1969). See also Burns v. Richardson, 384 U.S. 73, 91, 86 S.Ct. 1286, 1296, 16 L.Ed.2d 376 (1966) ("the Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which ... substantial population equivalency is to be measured."). The Court has never hinted that plaintiffs claiming present Voting Rights Act violations should be required to wait until the next census before they can receive any remedy.
 
 
 34
 The Fifth Circuit has held that non-census data may be considered in reapportionments between censuses if the relevant information cannot be obtained through census data. Westwego Citizens for Better Government v. Westwego, 906 F.2d 1042, 1045-46 (5th Cir.1990). Such a practice makes sense not only where, as in Westwego itself, census data on the population in question was unavailable because of the limited nature of the compilations and manipulations performed by the census; it is also logical where, as here, the census data is almost a decade old and therefore no longer accurate.[3]
 
 
 35
 The County contests the validity of the population statistics that the court employed. The district court's findings, however, present an extensive review of the data itself and of the methodology that produced it, coupled with an inquiry into its validity. The County has not offered any reason why the district court should have rejected this data, other than the fact that it does not come from the census. Since it was permissible for the district court to rely on non-census data, we find that the district court did not err in its assessment of the size and geographic distribution of the Hispanic population in Los Angeles.
 
 
 36
 The district court's findings concerning vote dilution may be set aside only if they are clearly erroneous. Gingles, 478 U.S. at 79, 106 S.Ct. at 2781. The findings at issue here were amply supported by the evidence that was before the district court.
 
 
 37
 C. Apportionment Based on Population Rather than Voting Age
 
 Citizen Data
 
 38
 The County contends that because the district court's reapportionment plan employs statistics based upon the total population of the County, rather than the voting population, it is erroneous as a matter of law. The County points out that many Hispanics in the County are noncitizens, and suggests that therefore a redistricting plan based upon population alone, in which Hispanics are concentrated in one district, unconstitutionally weights the votes of citizens in that district more heavily than those of citizens in other districts.
 
 
 39
 The district court adopted a plan with nearly equal numbers of persons in each district.[4] The districts deviated in population by sixty-eight hundredths of one percent. (Findings and Order Regarding Remedial Redistricting Plan and Election Schedule, 4). The variance is larger when the number of voting age citizens in each district is considered.[5]
 
 
 40
 The County is correct in pointing out that Burns v. Richardson, 384 U.S. 73, 91-92, 86 S.Ct. 1286, 1296-97, 16 L.Ed.2d 376 (1966), seems to permit states to consider the distribution of the voting population as well as that of the total population in constructing electoral districts. It does not, however, require states to do so. In fact, the Richardson Court expressly stated that "[t]he decision to include or exclude [aliens or other nonvoters from the apportionment base] involves choices about the nature of representation with which we have been shown no constitutionally founded reason to interfere." 384 U.S. at 92, 86 S.Ct. at 1296-97. Richardson does not overrule the portion of Reynolds v. Sims, 377 U.S. 533, 568, 84 S.Ct. 1362, 1385, 12 L.Ed.2d 506 (1964), that held that apportionment for state legislatures must be made upon the basis of population.
 
 
 41
 In Reynolds, 377 U.S. at 560-61, 84 S.Ct. at 1381, the Supreme Court applied to the apportionment of state legislative seats the standard enunciated in Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), that "the fundamental principle of representative government is one of equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a state." This standard derives from the constitutional requirement that members of the House of Representatives are elected "by the people," Reynolds, 377 U.S. at 560, 84 S.Ct. at 1381, from districts "founded on the aggregate number of inhabitants of each state" (James Madison, The Federalist, No. 54 at 369 (J. Cooke ed. 1961)); U.S. Const. art. I, Sec. 2. The framers were aware that this apportionment and representation base would include categories of persons who were ineligible to vote--women, children, bound servants, convicts, the insane, and, at a later time, aliens. Fair v. Klutznick, 486 F.Supp. 564, 576 (D.D.C.1980). Nevertheless, they declared that government should represent all the people. In applying this principle, the Reynolds Court recognized that the people, including those who are ineligible to vote, form the basis for representative government. Thus population is an appropriate basis for state legislative apportionment.
 
 
 42
 Furthermore, California state law requires districting to be accomplished on the basis of total population. California Elections Code Sec. 35000. No part of the holding in Richardson, or in any other case cited by the appellants, suggests that the requirements imposed by such state laws may be unconstitutional. In fact, in Gaffney v. Cummings, 412 U.S. 735, 747, 93 S.Ct. 2321, 2328, 37 L.Ed.2d 298 (1973), the Court approved a redistricting based on total population, but with some deviations based upon consideration of political factors. In approving that plan, the Court expressly noted that districting based upon total population would lead to some disparities in the size of the eligible voting population among districts. These differences arise from the number of people ineligible to vote because of age, alienage, or non-residence, and because many people choose not to register or vote. Id. at 746-47, 93 S.Ct. at 2328. The Court made no intimation that such disparities would render those apportionment schemes constitutionally infirm.
 
 
 43
 Even the limited latitude Gaffney affords state and local governments to depart from strict total population equality is unavailable here. The Supreme Court has held that unless a court ordering a redistricting plan can show that population variances are required by "significant state policies", that court must devise a plan that provides for districts of equal population. Chapman v. Meier, 420 U.S. 1, 24, 95 S.Ct. 751, 764, 42 L.Ed.2d 766 (1975). Since California law requires equality of total population across districts, there are no locally relevant contrary policies.
 
 
 44
 There is an even more important consideration. Basing districts on voters rather than total population results in serious population inequalities across districts. Residents of the more populous districts thus have less access to their elected representative. Those adversely affected are those who live in the districts with a greater percentage of non-voting populations, including aliens and children. Because there are more young people in the predominantly Hispanic District 1 (34.5% of the L.A. County Hispanic population (Findings of Fact and Conclusions of Law re: County's Remedial Plan, 5-6)), citizens of voting age, minors and others residing in the district will suffer diminishing access to government in a voter-based apportionment scheme.
 
 
 45
 The purpose of redistricting is not only to protect the voting power of citizens; a coequal goal is to ensure "equal representation for equal numbers of people." Kirkpatrick, 394 U.S. at 531, 89 S.Ct. at 1229. Interference with individuals' free access to elected representatives impermissibly burdens their right to petition the government. Eastern Railroad President's Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 137, 81 S.Ct. 523, 539, 5 L.Ed.2d 464, reh'g denied, 365 U.S. 875, 81 S.Ct. 899, 5 L.Ed.2d 864 (1961). Since "the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives", this right to petition is an important corollary to the right to be represented. Id. Non-citizens are entitled to various federal and local benefits, such as emergency medical care and pregnancy-related care provided by Los Angeles County. California Welfare and Institutions Code Secs. 14007.5, 17000. As such, they have a right to petition their government for services and to influence how their tax dollars are spent.
 
 
 46
 In this case, basing districts on voting population rather than total population would disproportionately affect these rights for people living in the Hispanic district. Such a plan would dilute the access of voting age citizens in that district to their representative, and would similarly abridge the right of aliens and minors to petition that representative. For over a century, the Supreme Court has recognized that aliens are "persons" within the meaning of the fourteenth amendment to the Constitution, entitled to equal protection. See Yick Wo v. Hopkins, 118 U.S. 356, 368, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886). This equal protection right serves to allow political participation short of voting or holding a sensitive public office. See Bernal v. Fainter, 467 U.S. 216, 104 S.Ct. 2312, 81 L.Ed.2d 175 (1984) (law that would have denied alien the right to become a notary public and thereby assist in litigation for the benefit of migrant workers struck down under strict scrutiny equal protection analysis); Nyquist v. Mauclet, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977) (state's interest in educating its electorate does not justify excluding aliens from state scholarship program, since aliens may participate in their communities in ways short of voting). Minors, too, have the right to political expression. Tinker v. Des Moines Community School Dist., 393 U.S. 503, 511-13, 89 S.Ct. 733, 739-40, 21 L.Ed.2d 731 (1969). To refuse to count people in constructing a districting plan ignores these rights in addition to burdening the political rights of voting age citizens in affected districts.
 
 
 47
 The principles were well expressed by the California Supreme Court in its opinion in Calderon v. City of Los Angeles, 4 Cal.3d 251, 258-59, 93 Cal.Rptr. 361, 365-66, 481 P.2d 489 (1971), in holding that the United States Constitution requires apportionment by total population, not by voting population.
 
 
 48
 Although we are, of course, constrained by the supremacy clause (U.S. Const., art VI, cl. 2) to follow decisions of the Supreme Court on matters of constitutional interpretation, we emphasize that we do so here not only from constitutional compulsion but also as a matter of conviction. Adherence to a population standard, rather than one based on registered voters, is more likely to guarantee that those who cannot or do not cast a ballot may still have some voice in government.
 
 
 49
 Thus a 17-year-old, who by state law is prohibited from voting, may still have strong views on the Vietnam War which he wishes to communicate to the elected representative from his area. Furthermore, much of a legislator's time is devoted to providing services and information to his constituents, both voters and nonvoters. A district which, although large in population, has a low percentage of registered voters would, under a voter-based apportionment, have fewer representatives to provide such assistance and to listen to concerned citizens. (footnote omitted).
 
 
 50
 Judge Kozinski's dissent would require districting on the basis of voting capability. Adoption of Judge Kozinski's position would constitute a denial of equal protection to these Hispanic plaintiffs and rejection of a valued heritage.
 
 D. Rejection of the Supervisors' Proposal
 
 51
 After it found that the County's districting plan was statutorily and constitutionally invalid, the district court gave the County 20 days to develop and propose a remedial plan of its own. The County submitted a plan, but the district court rejected it because, although it did create a district that had a Hispanic majority, it unnecessarily fragmented other Hispanic populations in the County. The district court found that such fragmentation posed an impediment to Hispanic political cohesiveness. Furthermore, the district court objected to the placement of the Hispanic majority district in a section controlled by a powerful incumbent, rather than in the one section that had a naturally occurring open seat, an open seat that was "in the heart of the Hispanic core." For these reasons, the district court found that the County's plan did not represent a good faith effort to remedy the violation.
 
 
 52
 The County objects to the district court's rejection of its proposal. It argues that the district court may not substitute "even what it considers to be an objectively superior plan for an otherwise constitutionally and legally valid plan," citing Wright v. City of Houston, 806 F.2d 634 (5th Cir.1986); Seastrunk v. Burns, 772 F.2d 143, 151 (5th Cir.1985).
 
 
 53
 However, there appear to be at least two fundamental reasons why the district court was not required to defer to the plan put forward by the supervisors in this case. First, as two of the supervisors themselves point out in their separate brief on the issue, the plan that the Board submitted to the district court could not, under the County's charter, have been considered a Board Redistricting plan, because only three members voted in favor of it, not the four required for such matters. Los Angeles County Charter, Art. II, Sec. 7 (1985). Thus, the proposal was not an act of legislation; rather, it was a suggestion by some members of the Board, entitled to consideration along with the other suggestions that had been received. Second, the district court found that it did not constitute a good faith attempt to remedy the violation because, inter alia, it used unnatural configurations in order to place an Anglo incumbent in the new Hispanic district, and it fragmented some Hispanic communities in other districts in the same manner in which the Board had deliberately diluted Hispanic influence in the past.
 
 
 54
 E. The County's Claim of Reverse Discrimination
 
 
 55
 The County argues that, by deliberately creating a district with a Hispanic majority, the district court engaged in discrimination in favor of a minority group of the type forbidden by City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). It claims to have had a valid defense based upon the district court's "creation of an equal protection violation in order to establish a Section 2 claim." The district court erred, it contends, in refusing to address this constitutional defense.
 
 
 56
 The County makes no suggestion, however, that the redistricting plan somehow dilutes the voting strength of the Anglo community. The deliberate construction of minority controlled voting districts is exactly what the Voting Rights Act authorizes. Such districting, whether worked by a court or by a political entity in the first instance, does not violate the constitution. United Jewish Organizations v. Carey, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). For that reason, the district court properly refused to consider the appellants' constitutional defense.
 
 III. The Flores Appeal
 
 57
 Sarah Flores appeals from the district court's denial of her petition to intervene. Her petition was based upon her interest in the outcome of the suit as a candidate in the election that stood to be invalidated. Under the plan adopted by the district court, she would be eligible to run for election in the new Hispanic district. Under the status quo, she was scheduled to participate in a runoff election against one other candidate. The district court dismissed her petition to intervene because it was untimely and because, in any event, the interests that she claimed to advocate either were already represented in the case or had not been proven to exist.
 
 
 58
 A party is entitled to intervene as of right under Fed.R.Civ.Pro. 24(a)(2) if that party moves to do so in a timely fashion and asserts an interest in the subject of the litigation, shows that the asserted interest stands to be impeded or impaired if the litigation goes forth without intervention, and demonstrates that the interest is not adequately represented by the parties to the litigation. Sagebrush Rebellion, Inc. v. Watt, 713 F.2d 525, 527 (9th Cir.1983). In determining whether a motion to intervene is timely, a court must consider whether intervention will cause delay that will prejudice the existing parties. United States v. Oregon, 745 F.2d 550, 552 (9th Cir.1984).
 
 
 59
 Where a would-be intervenor does not demonstrate interests sufficiently weighty to warrant intervention as of right, the court may nevertheless consider eligibility for permissive intervention under Fed.R.Civ.Pro. 24(b)(2). Courts will allow such intervention where the intervenor raises a claim that has questions of law or fact in common with the main case, shows independent grounds for jurisdiction, and moves to intervene in a timely fashion. Venegas v. Skaggs, 867 F.2d 527, 529 (9th Cir.1989), aff'd, --- U.S. ----, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990). The decision to grant or deny this type of intervention is discretionary, subject to considerations of equity and judicial economy. Id. at 530-31. Sarah Flores sought both intervention as of right and, in the alternative, permissive intervention in the proceedings below. The district court denied intervention on either ground.
 
 
 60
 This ruling was correct. Flores knew that this lawsuit was pending at the time when she decided to run in the election, and knew that part of the relief sought was a redistricting plan that could affect the outcome of that election. She did not petition to intervene until four months after she declared her candidacy, which was almost two years after the proceedings had been instituted. While Flores points out that the entry of a trial into a "new stage" may be the appropriate point for intervention, such is only the case where the new phase develops as a result of a change in the law or the factual circumstances. See United States v. Oregon, 745 F.2d 550 (9th Cir.1984). Here, the new phase came about in the general progression of the case to a close. It was a foreseeable part of a chain of events. Therefore, Flores' delay cannot be excused on this ground. Introduction of a new party at that late stage could have resulted in irreversible prejudicial delay in a case where time was of the essence.
 
 IV. The Election
 
 61
 A motions panel of this court entered an order which had the effect of staying the County's election procedures pending our decision. Because the time schedule originally contemplated by the district court's order can no longer be followed, we REMAND for the district court to impose a new schedule pursuant to which the primary, and if necessary, a general election can be conducted. Because it is imperative that such election procedures go forward as soon as practicable, the opinion of this panel shall constitute the mandate.
 
 
 62
 The judgment of the district court on liability and its decision as to remedy are AFFIRMED. The scheduling provisions of the district court's order of August 6, 1989 are VACATED and the matter is REMANDED for the purpose of determining the schedule for elections under the district court's redistricting plan. We issue the mandate now because 42 U.S.C. Sec. 1971(g) requires that voting rights cases "be in every way expedited."AFFIRMED IN PART; VACATED IN PART AND REMANDED. THE MANDATE SHALL ISSUE FORTHWITH.
 
 
 63
 KOZINSKI, Circuit Judge, concurring and dissenting in part:
 
 I. Liability
 
 64
 A determination by a federal court that elected officials have intentionally discriminated against some of their constituents is a matter of no little moment. While I join the liability portion of Judge Schroeder's opinion without reservation, I write briefly to explain, for the benefit of those not conversant with the esoterica of federal discrimination law, what today's ruling means--and what it does not.
 
 
 65
 First the good news. Nothing in the majority opinion, or in the district court's findings which we review and approve today, suggests that the County supervisors who adopted the 1981 reapportionment--all of whom are still in office--harbored any ethnic or racial animus toward the Los Angeles Hispanic community. In other words, there is no indication that what the district court found to be intentional discrimination was based on any dislike, mistrust, hatred or bigotry against Hispanics or any other minority group. Indeed, the district court seems to have found to the contrary. See Garza v. County of Los Angeles, Nos. 88-5143 & 88-5435, at 7 (C.D.Cal. June 4, 1990) ("The Court believes that had the Board found it possible to protect their incumbencies while increasing Hispanic voting strength, they would have acted to satisfy both objectives.").[1]
 
 
 66
 Which brings us to what this case does stand for. When the dust has settled and local passions have cooled, this case will be remembered for its lucid demonstration that elected officials engaged in the single-minded pursuit of incumbency can run roughshod over the rights of protected minorities. The careful findings of the district court graphically document the pattern--a continuing practice of splitting the Hispanic core into two or more districts to prevent the emergence of a strong Hispanic challenger who might provide meaningful competition to the incumbent supervisors. The record is littered with telltale signs that reapportionments going back at least as far as 1959 were motivated, to no small degree, by the desire to assure that no supervisorial district would include too much of the burgeoning Hispanic population.
 
 
 67
 But the record here illustrates a more general proposition: Protecting incumbency and safeguarding the voting rights of minorities are purposes often at war with each other. Ethnic and racial communities are natural breeding grounds for political challengers; incumbents greet the emergence of such power bases in their districts with all the hospitality corporate managers show hostile takeover bids. What happened here--the systematic splitting of the ethnic community into different districts--is the obvious, time-honored and most effective way of averting a potential challenge. Incumbency carries with it many other subtle and not-so-subtle advantages, see Chemerinsky, Protecting the Democratic Process: Voter Standing to Challenge Abuses of Incumbency, 49 Ohio St.L.J. 773, 774-81 (1988), and incumbents who take advantage of their status so as to assure themselves a secure seat at the expense of emerging minority candidates may well be violating the Voting Rights Act. Today's case barely opens the door to our understanding of the potential relationship between the preservation of incumbency and invidious discrimination, but it surely gives weight to the Seventh Circuit's observation that "many devices employed to preserve incumbencies are necessarily racially discriminatory." Ketchum v. Byrne, 740 F.2d 1398, 1408 (7th Cir.1984), cert. denied, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985).
 
 
 68
 The Supreme Court in Davis v. Bandemer, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), left open whether and under what circumstances political gerrymandering may amount to a violation of the Voting Rights Act. Id. at 118 n. 8, 106 S.Ct. at 2803 n. 8. The record before us strongly suggests that political gerrymandering tends to strengthen the grip of incumbents at the expense of emerging minority communities. Where, as here, the record shows that ethnic or racial communities were split to assure a safe seat for an incumbent, there is a strong inference--indeed a presumption--that this was a result of intentional discrimination, even absent the type of smoking gun evidence uncovered by these plaintiffs. State and local officials nationwide might well take this lesson to heart as they go about the task of decennial redistricting.
 
 II. The Remedy
 
 69
 While I enthusiastically join the majority as to liability, I have two points of disagreement as to the remedy. The first is really just a quibble: I agree with the majority that the County's proposed plan was not entitled to any deference. The Los Angeles County Charter requires at least four supervisors to pass a reapportionment plan. Los Angeles County Charter Art. 2, Sec. 7. Since two of the five supervisors opposed the plan proposed by the County, see maj. op. at 776, it is obvious that the "proposal was not an act of legislation; rather, it was a suggestion by some members of the Board," id., not entitled to the special deference afforded apportionment plans that are the legislative act of the apportioning body.
 
 
 70
 The majority's alternative reason for upholding the district court's rejection of the plan, contained in the last sentence of part II.D of the opinion, is therefore dicta, and dicta about which I harbor some doubt. It is not at all clear to me that, had the Board of Supervisors adopted the apportionment plan proposed by the County, the reasons relied on by the district court for rejecting the plan would be sufficient. Certainly the issue is far more difficult than the majority's casual reference acknowledges. I would prefer to see a more detailed discussion of the issue before adopting the majority's conclusion as the law of the circuit, but a more extensive discussion is inappropriate, as it's all dicta anyhow. The more prudent course would be to reserve the issue for a day when it is squarely presented to us.
 
 
 71
 My second disagreement is more substantive; I cannot agree with the majority's conclusion, contained in part II.C of the opinion, that the district court's reapportionment plan complies with the one person one vote principle announced by the Supreme Court in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). While the majority may ultimately be vindicated, its conclusion is hard to square with what the Supreme Court has said on this issue up to now.
 
 
 72
 A. Before plumbing the doctrinal waters in this murky area of constitutional law, it is worth stating exactly what the County is complaining about. In drawing the remedial plan in this case, the district court adhered closely to state law which calls for supervisorial districts that are equal in population. In doing so, the court wound up with two districts where the numbers of voting age citizens are markedly lower than those in the three other districts.[2] The disparity is particularly great between Districts 1 and 3. District 1 has 707,651 eligible voters while District 3 has 1,098,663, a difference of 391,012, about 55% of the eligible voters in District 1. Since it takes a majority in each district to elect a supervisor, this means that the supervisor from District 1 can be elected on the basis of 353,826 votes (less than the difference between the two districts), while the supervisor from District 3 requires at least 549,332 votes. Put another way, a vote cast in District 1 counts for almost twice as much as a vote cast in District 3.
 
 
 73
 B. Does a districting plan that gives different voting power to voters in different parts of the county impair the one person one vote principle even though raw population figures are roughly equal? It certainly seems to conflict with what the Supreme Court has said repeatedly. For example, in Reynolds, the Court stated: "Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable." 377 U.S. at 563, 84 S.Ct. at 1382. The Court also stated: "With respect to the allocation of legislative representation, all voters, as citizens of a State, stand in the same relation regardless of where they live," id. at 565, 84 S.Ct. at 1383; and "Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State," id. at 568, 84 S.Ct. at 1385;[3] and "the basic principle of representative government remains, and must remain, unchanged--the weight of a citizen's vote cannot be made to depend on where he lives," id. at 567, 84 S.Ct. at 1384.
 
 
 74
 Almost identical language appears in numerous cases both before Reynolds, see, e.g., Wesberry v. Sanders, 376 U.S. 1, 8, 84 S.Ct. 526, 530, 11 L.Ed.2d 481 (1964) ("To say that a vote is worth more in one district than in another would not only run counter to our fundamental ideas of democratic government, it would cast aside the principle of a House of Representatives elected 'by the People.' "); Gray v. Sanders, 372 U.S. 368, 379, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963) ("Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote--whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit."[4] ); and after, see, e.g., Hadley v. Junior College Dist., 397 U.S. 50, 56, 90 S.Ct. 791, 795, 25 L.Ed.2d 45 (1970) ("[W]hen members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials."); Chapman v. Meier, 420 U.S. 1, 24, 95 S.Ct. 751, 764, 42 L.Ed.2d 766 (1975) ("All citizens are affected when an apportionment plan provides disproportionate voting strength, and citizens in districts that are underrepresented lose something even if they do not belong to a specific minority group."); Lockport v. Citizens for Community Action, 430 U.S. 259, 265, 97 S.Ct. 1047, 1052, 51 L.Ed.2d 313 (1977) ("[I]n voting for their legislators, all citizens have an equal interest in representative democracy, and ... the concept of equal protection therefore requires that their votes be given equal weight.").
 
 
 75
 The Court adhered to the same formulation as recently as two Terms ago: "In calculating the deviation among districts, the relevant inquiry is whether 'the vote of any citizen is approximately equal in weight to that of any other citizen.' " Board of Estimate v. Morris, 489 U.S. 688, 109 S.Ct. 1433, 1441, 103 L.Ed.2d 717 (1989) (quoting Reynolds, 377 U.S. at 579, 84 S.Ct. at 1390).
 
 
 76
 Despite these seemingly clear and repeated pronouncements by the Supreme Court, the majority's position is not without support, as the Court has also said things suggesting that equality of population is the guiding principle. See, e.g., Reynolds, 377 U.S. at 568, 84 S.Ct. at 1385 ("We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis."); Mahan v. Howell, 410 U.S. 315, 321, 93 S.Ct. 979, 983, 35 L.Ed.2d 320 (1973) ("[T]he basic constitutional principle [is] equality of population among the districts."); Kirkpatrick v. Preisler, 394 U.S. 526, 530, 89 S.Ct. 1225, 1228, 22 L.Ed.2d 519 (1969) (" '[E]qual representation for equal numbers of people [is] the fundamental goal for the House of Representatives.' " (quoting Wesberry, 376 U.S. at 18, 84 S.Ct. at 535)).
 
 
 77
 In most cases, of course, the distinction between the two formulations makes no substantive difference: Absent significant demographic variations in the proportion of voting age citizens to total population, apportionment by population will assure equality of voting strength and vice versa. Here, however, we do have a demographic abnormality, and the selection of an apportionment base does make a material difference: Apportionment by population can result in unequally weighted votes, while assuring equality in voting power might well call for districts of unequal population.
 
 
 78
 How does one choose between these two apparently conflicting principles? It seems to me that reliance on verbal formulations is not enough; we must try to distill the theory underlying the principle of one person one vote and, on the basis of that theory, select the philosophy embodied in the fourteenth amendment. Coming up with the correct theory is made no easier by the fact that the Court has been less than consistent in its choice of language and that, as Justice Harlan pointed out in his Reynolds dissent, "both the language and history of the controlling provisions of the Constitution [have been] wholly ignored" by the Court, 377 U.S. at 591, 84 S.Ct. at 1397 (Harlan, J., dissenting), making it impossible to rely on the Constitution for any meaningful guidance. Still we must try.
 
 
 79
 C. While apportionment by population and apportionment by number of eligible electors normally yield precisely the same result, they are based on radically different premises and serve materially different purposes. Apportionment by raw population embodies the principle of equal representation; it assures that all persons living within a district--whether eligible to vote or not--have roughly equal representation in the governing body.[5] A principle of equal representation serves important purposes: It assures that constituents have more or less equal access to their elected officials, by assuring that no official has a disproportionately large number of constituents to satisfy. Also, assuming that elected officials are able to obtain benefits for their districts in proportion to their share of the total membership of the governing body, it assures that constituents are not afforded unequal government services depending on the size of the population in their districts.
 
 
 80
 Apportionment by proportion of eligible voters serves the principle of electoral equality. This principle recognizes that electors--persons eligible to vote--are the ones who hold the ultimate political power in our democracy. This is an important power reserved only to certain members of society; states are not required to bestow it upon aliens, transients, short-term residents, persons convicted of crime, or those considered too young. See J. Nowak, R. Rotunda & J.N. Young, Constitutional Law Sec. 14.31, at 722-23 (3d ed. 1986).
 
 
 81
 The principle of electoral equality assures that, regardless of the size of the whole body of constituents, political power, as defined by the number of those eligible to vote, is equalized as between districts holding the same number of representatives. It also assures that those eligible to vote do not suffer dilution of that important right by having their vote given less weight than that of electors in another location. Under this paradigm, the fourteenth amendment protects a right belonging to the individual elector and the key question is whether the votes of some electors are materially undercounted because of the manner in which districts are apportioned.
 
 
 82
 It is very difficult, in my view, to read the Supreme Court's pronouncements in this area without concluding that what lies at the core of one person one vote is the principle of electoral equality, not that of equality of representation. To begin with, the name by which the Court has consistently identified this constitutional right--one person one vote--is an important clue that the Court's primary concern is with equalizing the voting power of electors, making sure that each voter gets one vote--not two, five or ten, Reynolds, 377 U.S. at 562, 84 S.Ct. at 1381; or one-half.
 
 
 83
 But we need not rely on inferences from what is essentially an aphorism, for the Court has told us exactly and repeatedly what interest this principle serves. In its most recent pronouncement in the area, the Court stated: "The personal right to vote is a value in itself, and a citizen is, without more and without mathematically calculating his power to determine the outcome of an election, shortchanged if he may vote for only one representative when citizens in a neighboring district, of equal population, vote for two; or to put it another way, if he may vote for one representative and the voters in another district half the size also elect one representative." Morris, 109 S.Ct. at 1440 (emphasis added).
 
 
 84
 References to the personal nature of the right to vote as the bedrock on which the one person one vote principle is founded appear in the case law with monotonous regularity. Thus, in Hadley v. Junior College District, the Court stated: "[T]he Fourteenth Amendment requires that the trustees of this junior college district be apportioned in a manner that does not deprive any voter of his right to have his own vote given as much weight, as far as is practicable, as that of any other voter in the junior college district." 397 U.S. at 52, 90 S.Ct. at 792. The Court further explained: "[A] qualified voter has a constitutional right to vote in elections without having his vote wrongfully denied, debased, or diluted," id. (footnote omitted); and "This Court has consistently held in a long series of cases, that in situations involving elections, the States are required to insure that each person's vote counts as much, insofar as it is practicable, as any other person's," id. at 54, 90 S.Ct. at 794 (footnote omitted); and "once a State has decided to use the process of popular election and 'once the class of voters is chosen and their qualifications specified, we see no constitutional way by which equality of voting power may be evaded,' " id. at 59, 90 S.Ct. at 797 (quoting Gray v. Sanders, 372 U.S. at 381, 83 S.Ct. at 809).
 
 
 85
 Reynolds itself brims over with concern about the rights of citizens to cast equally weighted votes: "[T]he judicial focus must be concentrated upon ascertaining whether there has been any discrimination against certain of the State's citizens which constitutes an impermissible impairment of their constitutionally protected right to vote." 377 U.S. at 561, 84 S.Ct. at 1381. Again: "Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature." Id. at 565, 84 S.Ct. at 1383.[6] And yet again: "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Id. at 555, 84 S.Ct. at 1378. Reynolds went so far as to suggest that "[t]o the extent that a citizen's right to vote is debased, he is that much less a citizen." Id. at 567, 84 S.Ct. at 1384.
 
 
 86
 While the Court has repeatedly expressed its concern with equalizing the voting power of citizens as an ultimate constitutional imperative--akin to protecting freedom of speech or freedom of religion--its various statements in support of the principle of equal representation have been far more conditional. Indeed, a careful reading of the Court's opinions suggests that equalizing total population is viewed not as an end in itself, but as a means of achieving electoral equality. Thus, the Court stated in Reynolds: "[T]he overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." Id. at 579, 84 S.Ct. at 1390 (emphasis added). This language has been quoted in numerous subsequent cases. See Gaffney, 412 U.S. at 744, 93 S.Ct. at 2327; Mahan v. Howell, 410 U.S. 315, 322, 93 S.Ct. 979, 984, 35 L.Ed.2d 320 (1973); Burns, 384 U.S. at 91 n. 20, 86 S.Ct. at 1296 n. 20. In Connor v. Finch, 431 U.S. 407, 416, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465 (1977), the Court stated the proposition as follows: "The Equal Protection Clause requires that legislative districts be of nearly equal population, so that each person's vote may be given equal weight in the election of representatives." (emphasis added).[7]
 
 
 87
 Particularly indicative of the subservience of the representational principle to the principle of electoral equality is Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), on which the majority mistakenly relies. Gaffney deals with the question of how much variation in population is permissible in effectuating the one person one vote principle of Reynolds. The Supreme Court held that absolute mathematical precision is not necessary. Total population, the Court pointed out, is only a proxy for equalizing the voting strength of eligible voters. But, the Court noted, it is not a perfect proxy; voters might not be distributed homogeneously throughout the population, for example. Therefore, "it makes little sense to conclude from relatively minor 'census population' variations among legislative districts that any person's vote is being substantially diluted." Gaffney, 412 U.S. at 745-46, 93 S.Ct. at 2327-28. The Court continued:
 
 
 88
 What is more, it must be recognized that total population, even if absolutely accurate as to each district when counted, is nevertheless not a talismanic measure of the weight of a person's vote under a later adopted reapportionment plan. The United States census is more of an event than a process. It measures population at only a single instant in time. District populations are constantly changing, often at different rates in either direction, up or down. Substantial differentials in population growth rates are striking and well-known phenomena. So, too, if it is the weight of a person's vote that matters, total population--even if stable and accurately taken--may not actually reflect that body of voters whose votes must be counted and weighed for the purposes of reapportionment, because "census persons" are not voters.
 
 
 89
 Id. at 746, 93 S.Ct. at 2328 (emphasis added, footnotes omitted).
 
 
 90
 Finally, there is the teaching of Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966), which the majority dismisses far too lightly. Because it is the only Supreme Court case applying the one person one vote principle in a situation where there were large numbers of residents not eligible to vote--it being the only case where there was a divergence between the representational principle and the principle of electoral equality--the case deserves a more careful examination. While Burns does not, by its terms, purport to require that apportionments equalize the number of qualified electors in each district, the logic of the case strongly suggests that this must be so. As noted earlier, in a situation such as ours--as that in Burns--one or the other of the principles must give way. If the ultimate objective were to serve the representational principle, that is to equalize populations, Burns would be inexplicable, as it approved deviations from strict population equality that were wildly in excess of what a strict application of that principle would permit.[8]
 
 
 91
 Burns can only be explained as an application of the principle of electoral equality; the Court approved the departure from strict population figures because raw population did not provide an accurate measure of whether the voting strength of each citizen was equal. Thus, while Burns spoke in permissive terms, its logic is far more categorical.
 
 
 92
 The only other way to explain the result in Burns is to assume that there is no principle at all at play here, that one person one vote is really nothing more than a judicial squinting of the eye, a rough-and-ready determination whether the apportionment scheme complies with some standard of proportionality the reviewing court happens to find acceptable. I am reluctant to ascribe such fluidity to a constitutional principle that the Supreme Court has told us embodies "fundamental ideas of democratic government," Wesberry, 376 U.S. at 8, 84 S.Ct. at 530.[9]
 
 
 93
 When considered against the Supreme Court's repeated pronouncements that the right being protected by the one person one vote principle is personal and limited to citizens, the various arguments raised by the majority do not carry the day. Thus, the Court's passing reference in Kirkpatrick v. Preisler, 394 U.S. 526, 531, 89 S.Ct. 1225, 1229, 22 L.Ed.2d 519 (1969), to "prevent[ing] debasement of voting power and diminution of access to elected representatives" suggests only that the Court did not consider the possibility that the twin goals might diverge in some cases. As Kirkpatrick contains no discussion of the issue, it provides no clue as to which principle has primacy where there is a conflict between the two.
 
 
 94
 Similarly unpersuasive is the majority's citation of cases that hold that aliens and the young enjoy many constitutional rights on the same basis as citizens. Maj. op. at 775. One right aliens and children do not enjoy is the right to vote. Insofar as the Court views its one person one vote jurisprudence as protecting the right to vote enjoyed only by citizens, see pp. 780-781 supra, it's entirely beside the point what other rights noncitizens may enjoy. If, as I suggest, one person one vote protects a right uniquely held by citizens, it would be a dilution of that right to allow noncitizens to share therein.[10]
 
 
 95
 Finally, I understand my colleagues to be suggesting that, as a matter of policy, the principle of equal representation is far wiser than the principle of electoral equality. Were I free to disregard the explicit and repeated statements of the Supreme Court, I might well find this argument persuasive. But I am not free to ignore what I regard as binding direction from the Supreme Court, so my own policy views on this matter make no difference.
 
 
 96
 All that having been said, I must acknowledge that my colleagues may ultimately have the better of the argument. We are each attempting to divine from language used by the Supreme Court in the past what the Court would say about an issue it has not explicitly addressed. While much of the language and some of the rationale of the Supreme Court's decisions clearly support my view, other language, as well as tradition, supports my colleagues. Were the Supreme Court to take up the issue, I would not be surprised to see it limit or abandon the principle of electoral equality in favor of a principle of representational equality. But the implications of that decision must be considered by those who have the power to make such choices, not by us. My colleagues may well be looking into the future, but controlling guidance comes from the past.
 
 
 97
 D. Having concluded that it is the principle of electoral equality that lies at the heart of one person one vote, we must address whether the district court's plan nevertheless falls within acceptable limits. While the Supreme Court has not been completely consistent in its methodology, usually it creates hypothetical ideal districts (i.e., districts that contain precisely the same number of people) and then determines, in percentage terms, the degree of deviation between each of the actual districts and the ideal one. The maximum deviation is calculated by adding the percentage points that the largest district is above the ideal, to the percentage points the smallest is below. See, e.g., Brown v. Thomson, 462 U.S. at 839, 103 S.Ct. at 2694, Mahan, 410 U.S. at 319, 93 S.Ct. at 982. While the Court has always used raw population figures, not electors, there seems to be no reason to apply a different methodology when comparing numbers of electors.
 
 
 98
 Here, a hypothetical ideal district would contain 979,594 electors. See note 2 supra. Compared to this ideal district, the districts under the plan adopted below deviate as set forth in the following table:
 
 
 99
 District # Electors Raw Deviation % Deviation
 1 707,651 -271,943 -28%
 2 922,180 -57,414 -6%
 3 1,098,663 k119,069 k12%
 4 1,081,089 k101,495 k10%
 5 1,088,388 k108,794 k11%
 
 
 
 As this table demonstrates, the districts in the court-ordered plan contain very significant deviations from the ideal district. As expected, the greatest spread is between Districts 1 and 3, and it amounts to 40%. Equally significant are the individual deviations. Only one district, number 2, has a number of electors close to the norm, i.e., a deviation within single digits. Three of the districts have deviations between 10% and 20% and one district has a deviation nearly three times that amount--28%.
 If I am right that it is qualified electors, not raw population figures, that count, these deviations fall far outside the acceptable range. The Supreme Court's cases in this area have defined three ranges of deviation that bear on the constitutionality of the plan. A maximum deviation of less than 10% is considered de minimis and will be acceptable without further inquiry. White v. Regester, 412 U.S. 755, 763, 93 S.Ct. 2332, 2338, 37 L.Ed.2d 314 (1973). Deviations somewhat above 10% may be acceptable if justified by compelling and legitimate interests. See, e.g., Abate v. Mundt, 403 U.S. 182, 184-85, 91 S.Ct. 1904, 1905-06, 29 L.Ed.2d 399 (1971). And, the Court has stated quite clearly that deviations above this buffer range will not be acceptable at all, even if justified by the most compelling and legitimate interests. The Court has not precisely identified the upper range for this buffer category, but does not appear to have approved any plans having a maximum deviation over 20%.[11]
 It should be noted that, in discussing the range of possible deviations, the Court in all of these cases was comparing total population figures. Gaffney, however, tells us that deviation in total population figures is permissible, to some extent at least, because raw population is only an approximation of the number of electors. 412 U.S. at 746, 93 S.Ct. at 2328. It may well be that where, as here, the comparison is between the number of electors, the permissible range of deviation is much narrower.
 Even if we apply to this case the ranges established by the Court in cases involving raw population figures, it is clear that the district court's plan falls far outside the permissible range. As far as I am aware, no plan has ever been approved with a maximum deviation of as much as 40%. If I read the Court's cases correctly, a deviation that large could not be justified even by the most compelling reasons. Nor, do I believe, has the district court even advanced reasons that would permit it to go beyond the 10% de minimis range. Such reasons may exist, but they are not articulated in the record. Four out of the five districts therefore fall outside the acceptable range for purposes of one person one vote.
 E. Having concluded that the district court's plan runs afoul of the one person one vote principle, we arrive at the single most difficult issue in this case: To what extent, if any, this principle may have to give way when it collides with a remedial plan designed to cure the effects of discrimination.
 There is, as far as I am aware, little or no guidance on this issue. All prior cases alleging violations of one person one vote involved a conflict between that constitutional principle and various interests advanced under state law. See, e.g., pp. 785-786 supra. Under such circumstances, even if the state is found to have a rational and compelling interest in deviating from substantial district equality, this interest may not justify more than a small range of deviations; beyond that, the state's interest gives way to the constitutional imperative.
 The balance may well be different where, as here, the competing interest is itself grounded in the fourteenth amendment or its derivative, the Voting Rights Act. What seems absolutely clear to me, however, is that the district court cannot simply ignore one person one vote in seeking to create a remedy. The Supreme Court has cautioned that district courts have "considerably narrower" discretion than state legislatures to depart from the ideal of one person one vote, and that "the burden of articulating special reasons for following [policies that would result in a departure are] correspondingly higher." Connor v. Finch, 431 U.S. 407, 419-20, 97 S.Ct. 1828, 1836, 52 L.Ed.2d 465 (1977). Moreover, "it is the reapportioning court's responsibility to articulate precisely why a plan of single-member districts with minimal population variance cannot be adopted." Chapman v. Meier, 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975).
 At the very least, it seems to me, the district court must make a determined effort to eliminate or minimize the electoral disparities within the districts, consistent with achieving the remedial purposes of the plan. In so doing, I should think the district court would have latitude of up to 20% maximum deviation from the ideal district, providing, of course, that it supplies an adequate explanation of why its purposes cannot be achieved within a narrower range.
 What if the district court determines that it cannot construct an adequate remedial plan without going beyond the 20% maximum deviation range? Under one view of the matter, one person one vote would not provide an absolute constraint on the court's remedial powers, as the competing interest here is not state law--which necessarily takes a back seat to a constitutional imperative--but an interest of equivalent dignity, itself growing out of the same constitutional roots as one person one vote. Under this paradigm, the district court would be allowed, under certain circumstances, to go beyond the 20% buffer allowed by the earlier cases. The district court would have to make very specific findings on how it has sought to achieve substantial equality among the districts and why it has been unable to do so without sacrificing the remedial purpose of the plan. If supported by the record (i.e., if no one comes forward with a plan that can do what the district court says can't be done), I should think that a much greater deviation from the ideal plan would be permissible, quite possibly as much as the 40% maximum deviation here.
 There is, however, another paradigm: A plausible case could be made that the district court gets no greater latitude when it acts pursuant to the Voting Rights Act because its remedial powers are absolutely constrained by the principle of one person one vote. The argument in support of this position grows not out of some hierarchy of values, but out of the nature of the remedial process. A reapportionment plan designed to remedy unlawful discrimination can have one purpose and one purpose only: To put the victims of discrimination in the position they would have enjoyed had there been no discrimination. Here, for example, the object would be to create the type of district that would have existed had the supervisors not continually split the Hispanic core.
 Even if we make the most favorable assumptions about what might have been, we cannot conclude that the supervisors would have come up with a district that violated the constitutional constraint of one person one vote. Since we know that, in the normal course of events and in the absence of discrimination, no such district could have been created, no legitimate remedial purpose would be served by creating such a district now. Under this view of the matter, there would be no tension between the court's remedial power and the principle of one person one vote, and therefore no justification for going beyond the 20% buffer. Even departures beyond the 10% de minimis buffer could, under this paradigm, be justified only upon a showing that compelling circumstances in the county would, in the absence of discrimination, have resulted in districts of greater than de minimis disparity.[12]
 It is unnecessary to explore this conundrum, however, as it seems absolutely clear that we must remand to the district court on this issue. To begin with, the district court constructed the remedial plan under the mistaken impression that it was constrained by the state law requirement that supervisorial districts be equal in population. It is clear, however, that where state law runs up against a constitutional constraint such as one person one vote, state law must yield. It is most emphatically not the case, as the majority suggests, that a district court, in drafting a remedial plan, is constrained by state apportionment law where that law would violate the Constitution.
 Remand is also appropriate because the district court was apparently not aware that it was, required to try--if at all possible--to construct a remedial plan that avoided the conflict between the two interests. Since the district court did not try, we do not know whether it is possible to reconcile both interests. A remand is necessary in order to find out. Only if it turns out that an effective remedial plan that also satisfies one person one vote cannot be constructed would I venture an opinion on the difficult question whether, to what extent and under what circumstances the principle of one person one vote must yield when the district court exercises its equitable powers to remedy the effects of past discrimination.
 III. Expedited Issuance of the Mandate
 Reluctantly, I must also part company with my colleagues in their decision to issue the mandate forthwith. As it is clear from this action that this panel will not grant a stay, we place an unnecessary burden upon the parties, the district judge, our own colleagues and the Justices above us.
 I well understand the reason for haste; delaying an election any longer than absolutely necessary should not be done lightly. Consistent with that imperative, we have issued a significant opinion in an important and difficult case about three weeks after submission. No one can justly accuse us of sitting on our thumbs. Were the opinion unanimous, or were I convinced that our differences are relatively trivial, I would go along with expediting the mandate.
 But we do not all agree. Moreover, our disagreement goes to the heart of the district court's remedial plan. Should there be further review, any steps taken by the district court and the parties in implementing the majority opinion would be wasted. The more prudent course, is seems to me, would be to let the parties consider their options in a sober, unhurried fashion, as contemplated by the Federal Rules of Appellate Procedure.
 My able colleagues have advanced very compelling arguments as to why the one person one vote rule should be construed as embodying the principle of equal representation. I have suggested that much of the Court's language and rationale supports the opposite view, that it is the principle of electoral equality that lies at the heart of one person one vote. We are not in a position to resolve this issue, which grows out of a lack of meaningful guidance in a long series of Supreme Court opinions. Yet this issue will have immediate and growing significance as large populations of aliens are taking up residence in several of our largest states.[13] The Supreme Court may deem it prudent to take up the issue before large-scale redistricting gets underway in 1991.
 Given these considerations, I would preserve the opportunity to have the matter considered in a deliberative fashion, unhurried by the pendency of an election. For better or worse, the election was stayed, which allowed us to consider the case without the sword of Damocles hanging over our heads. I would offer the same opportunity for unhurried deliberation to our colleagues and to any of the Justices who might wish to consider the matter.
 IV. Conclusion
 This is a fascinating case. It poses many new questions which required the district court to sail into uncharted waters. For the most part, the district court--and the majority--got it right. But close is not close enough when important constitutional rights are at stake. I would order a limited remand for the district court to apply the teachings of Reynolds v. Sims and its progeny.
 
 
 [1]
 The relevant findings with regard to the 1959 Redistricting are as follows:
 
 
 [64]
 Prior to 1959, District 3 included Western Rosemead and did not include any portion of the San Fernando Valley, Beverly Hills, West Hollywood, West Los Angeles, or Eagle Rock
 
 
 [65]
 The 1959 redistricting occurred less than six months after the November 1958 general election for the open position of District 3 Supervisor. Ernest Debs, a non-Hispanic, defeated Hispanic candidate Edward Roybal, by a margin of 52.2 percent to 47.8 percent
 
 
 [66]
 Debs received 141,011 votes. Roybal received 128,974 votes. There were four recounts before Debs was finally determined to be the winner
 
 
 [67]
 In 1959, Debs reported in a Supervisorial hearing that he and District 4 Supervisor Burton Chace agreed to shift Beverly Hills, West Hollywood, and West Los Angeles from District 4 to District 3
 
 
 [68]
 The Board's action transferred between 50,000 to 100,000 voters from District 4 into District 3 and had the effect of substantially decreasing the proportion of Hispanic voters in District 3
 
 
 [69]
 Dr. Kousser testified it was his opinion that Debs and Chace agreed to the transfer for two reasons. First, Chace was receptive to the agreement because it enabled him to eliminate Los Angeles City Councilwoman Rosaline Wyman as a possible opponent in his upcoming 1960 bid for reelection. Debs welcomed the change because the move west allowed him to make District 3 more easily winnable against Roybal or another candidate who might appeal to Hispanic voters in the next election
 The findings with regard to the 1965 Redistricting are as follows:
 
 
 [88]
 The Boundary Committee rejected a proposal to move Alhambra and San Gabriel, areas adjacent to growing Hispanic population, from District 1 to District 3. Instead, the committee recommended a complicated two-stage change which moved Alhambra and San Gabriel from Supervisor Bonnelli's District 1 to Supervisor Dorn's District 5, moved a section of the San Fernando Valley from District 5 to Supervisor Debs' District 3, and moved Monterey Park and unincorporated South San Gabriel from District 1 to District 3
 
 
 [89]
 Dr. Kousser testified that, in his opinion, the Board avoided transferring Alhambra and San Gabriel directly to District 3 because those areas were adjacent to areas of Hispanic population concentration and were becoming more Hispanic. The more complicated two-stage adjustments permitted the addition of heavily Anglo areas from the San Fernando Valley and offset the much more limited addition of Hispanic population gained by moving Monterey Park and the unincorporated area of South San Gabriel to District 3
 The court's findings with regard to the 1971 Redistricting are as follows:
 
 
 [109]
 In 1971, District 3 lost some areas with substantial Hispanic population on its eastern border. Western Rosemead was transferred from District 3 to District 1. A census tract in the City of San Gabriel was also transferred from District 3 to District 5
 
 
 [110]
 George Marr, head of the Population Research Section of the Department of Regional Planning testified that he was surprised by the proposal to move a substantial portion of the San Fernando Valley from District 5 to District 3. Marr described the portion of the San Fernando Valley ultimately added to District 3 from District 5 as looking like "one of those Easter Island heads." Marr developed the general feeling that Debs' representative on the Boundary Committee had requested the additional area in the San Fernando Valley because the residents of the area were regarded as "our kind of people."
 The court's findings on the Overall Intent of Past Redistrictings are as follows:
 
 
 [112]
 The Court finds that the Board has redrawn the supervisorial boundaries over the period 1959-1971, at least in part, to avoid enhancing Hispanic voting strength in District 3, the district that has historically had the highest proportion of Hispanics and to make it less likely that a viable, well financed Hispanic opponent would seek office in that district. This finding is based on both direct and circumstantial evidence, including the finding that, since the defeat of Edward Roybal in 1959, no well-financed Hispanic or Spanish-surname candidate has run for election in District 3
 
 
 [113]
 While Hispanic population was added to District 3 during the 1959-1971 redistrictings, the Court finds that the proportion of Spanish-surname persons added to District 3 has been lower than the Hispanic population proportion in the County as a whole. No individual area added was greater than 15.1 percent Spanish-surname
 
 
 [114]
 Dating from the adoption of the County's Charter in 1912 through the 1971 redistricting process, no Los Angeles County redistricting plan has created a supervisorial district in which Hispanic persons constituted a majority or a plurality of the total population
 The court's findings with regard to the 1981 Redistricting are as follows:
 
 
 [125]
 The individuals involved in the 1981 redistricting had demographic information available of population changes and trends in Los Angeles County from 1950 to 1980. It was readily apparent in 1980 that the Hispanic population was on the rise and growing rapidly and that the white non-Hispanic population was declining
 
 
 [127]
 From a political perspective, since Hispanic population growth was most significant in Districts 1 and 3, if the 1971 boundaries were changed in any measurable way to eliminate the existing fragmentation, the incumbency of either Supervisor Schabarum or Supervisor Edelman would be most affected by a potential Hispanic candidate
 
 
 [136]
 An analysis of the 1978 Supervisor election in District 3 was conducted after the Boundary Committee recommended a plan with an Hispanic population majority in District 3. The actual results of the analysis were never produced. Mr. Seymour did not rule out the possibility that he requested such an analysis and Supervisor Edelman testified that he "most probably" discussed the results of the 1978 election analysis with Mr. Seymour
 
 
 [137]
 Peter Bonardi, a programmer with the Urban Research Section of the Data Processing Department in 1981 and a participant in the data analysis requested by Supervisor Edelman, stated that he was directed not to talk about the analysis of voting patterns and that an "atmosphere of 'keep it quiet' " pervaded
 
 
 [138]
 Supervisors Hahn and Edelman sought to maintain the existing lines. To this end, the Democratic minority agreed to a transfer of population from District 3 to District 2. Supervisor Edelman acknowledged that he and Supervisor Hahn had worked out a transfer of population from the heavily Hispanic Pico-Union area on the southern border of District 3 to the northern end of District 2
 
 
 [139]
 Supervisor Edelman knew that if the 1971 boundary lines were kept intact, the Hispanic community was going to remain essentially the same in terms of its division among the districts
 
 
 [140]
 The Board departed from its past redistricting practice in 1981 and approved a contract with The Rose Institute for State and Local Government, a private entity, to perform specialized services and produce redistricting data at a cost of $30,000
 
 
 [157]
 [Boundary Committee Members] Smith and Hoffenblum opposed the CFR [Chicanos for Fair Representation] plan because the plan proposed increasing the Hispanic proportion in District 1 from 36 to 42 percent. Both Boundary Committee members perceived the CFR effort as intended to jeopardize the status of Supervisor Schabarum as well as that of the conservative majority
 
 
 [158]
 Hoffenblum testified that one of the objectives of the Republican majority was to create an Hispanic seat without altering the ideological makeup of the Board. According to Hoffenblum, it was "self-evident" that if an Hispanic district was created in Supervisor Schabarum's district it would impact on the Republican majority
 
 
 [159]
 The proponents of the Smith and Hoffenblum plans sought to gain areas of Republican strength such as La Mirada, Arcadia, Bradbury in Districts 4 and 5, while losing increasing Hispanic areas such as Alhambra or the predominantly black Compton and other liberal areas of Santa Monica and Venice
 
 
 [162]
 Supervisor Edelman would not rule out the possibility that ethnic considerations played at least some part in the rejection by the Board majority of the CFR Plan. Moreover, the fact that CFR proposed a plan in which District 1 had a 42 percent Hispanic population was a possible basis for the rejection of the plan by the majority. Supervisor Schabarum would not accept a 45 or 50 percent Hispanic proportion in his district in 1981
 
 
 [165]
 On September 24, 1981, prior to the Board's adoption of the challenged plan, Board members met, two at a time in a series of private meetings in the anteroom adjacent to the board room, where they tried to reach agreement on a plan
 
 
 [175]
 The plan adopted in 1981 retained the boundary between the First and the Third Supervisorial Districts, the districts that contain the largest proportions of Hispanics. In doing so, the 1981 Plan continued to split the Hispanic Core almost in half
 
 
 [176]
 The Board appeared to ignore the three proposed plans which provided for a bare Hispanic population majority
 
 
 [177]
 The Court finds that the Board of Supervisors, in adopting the 1981 redistricting plan, acted primarily with the objective of protecting and preserving the incumbencies of the five Supervisors or their political allies
 
 
 [178]
 The Court finds that in 1981 the five members of the Board of Supervisors were aware that the plan which they eventually adopted would continue to fragment the Hispanic population and further impair the ability of Hispanics to gain representation on the Board
 
 
 [179]
 The continued fragmentation of the Hispanic vote was a reasonably foreseeable consequence of the adoption of the 1981 Plan
 
 
 [180]
 The Court finds that during the 1981 redistricting process, the Supervisors knew that the protection of their five Anglo incumbencies was inextricably linked to the continued fragmentation of the Hispanic Core
 
 
 [181]
 The Supervisors appear to have acted primarily on the political instinct of self-preservation. The Court finds, however, that the Supervisors also intended what they knew to be the likely result of their actions and a prerequisite to self-preservation--the continued fragmentation of the Hispanic Core and the dilution of Hispanic voting strength
 
 
 [2]
 Gingles has spawned confusion in the lower courts. The opinion explicitly reserved the question of whether the standards it set forth would apply to a claim in which minority plaintiffs alleged that an electoral practice impaired their ability to influence elections, as opposed to their ability to elect representatives. 478 U.S. at 46 n. 12, 106 S.Ct. at 2764 n. 12. Nevertheless, it has been applied to preclude such "ability to influence" claims, based upon plaintiffs' failure to demonstrate such an ability to elect representatives under the Gingles criteria. See, e.g., McNeil v. Springfield Park, 851 F.2d 937 (7th Cir.1988), cert. denied, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989). See generally Abrams, "Raising Politics Up": Minority Political Participation and Section 2 of the Voting Rights Act, 63 N.Y.U.L.Rev. 449 (1988). On the other hand, some courts have dealt differently with the criteria articulated in Gingles when facing "ability to influence" claims. They have done so in opinions that "range from virtually ignoring the electoral standard or ignoring it entirely, to considering it a prerequisite to the application of the totality of the circumstances test [specified in the statute itself], to treating it as a, if not the, central element of the test." Abrams, 63 N.Y.U.L.Rev. at 465 (citing United Latin Am. Citizens v. Midland Indep. School Dist., 812 F.2d 1494, 1496-98 (5th Cir.1987), Buckanaga v. Sisseton Indep. School. Dist., 804 F.2d 469, 471-72 (8th Cir.1986); Martin v. Allain, 658 F.Supp. 1183, 1199-1204 (S.D.Miss.1987)) (footnotes omitted). "[T]he language from Gingles that creates the 'ability to elect' standard may prove to be Gingles ' more enduring and problematic legacy." Abrams, 63 N.Y.U.L.Rev. at 468
 
 
 [3]
 In McNeil v. Springfield Park District, 851 F.2d 937, 946 (7th Cir.1988), cert. denied, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989), the Seventh Circuit found that in order to prove an effects violation from post-census data, the data used must be of a clear and convincing nature, and that "estimates based on past trends are generally not sufficient to override 'hard' decennial census data." We see no reason to impose this high standard in a case where intentional discrimination has been proved, and the data is merely to be used in fashioning a remedy
 
 
 [4]
 
 District Total Pop. White Black Hispanic Other
 1 1,779,835 12.4 2.1 71.2 14.3
 2 1,775,665 15.0 38.6 35.3 11.1
 3 1,768,124 60.9 3.9 25.5 9.7
 4 1,776,240 53.9 4.3 26.6 15.2
 5 1,780,224 57.1 5.9 24.3 12.6
 Total 8,880,109 39.8 11.0 36.6 12.6
 
 
 [5]
 
 District Total White Black Hispanic Other
 1 707,651 25.4 3.5 59.4 11.6
 2 922,180 23.8 50.8 17.1 8.3
 3 1,098,663 77.0 4.3 13.9 4.7
 4 1,081,089 67.5 4.4 19.7 8.4
 5 1,088,388 69.8 6.2 18.1 5.9
 Total 4,897,971 55.8 13.4 23.3 7.5
 
 
 [1]
 The lay reader might wonder if there can be intentional discrimination without an invidious motive. Indeed there can. A simple example may help illustrate the point. Assume you are an anglo homeowner who lives in an all-white neighborhood. Suppose, also, that you harbor no ill feelings toward minorities. Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values and that you stand to lose a lot of money on your home. On the basis of that belief, you join a pact not to sell your house to minorities. Have you engaged in intentional racial and ethnic discrimination? Of course you have. Your personal feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood
 
 
 [2]
 The district court's remedy finding No. 5 sets forth the relevant figures for the districting plan it adopted:
 District Total White Black Hispanic Other
 1 707,651 25.4 3.5 59.4 11.6
 2 922,180 23.8 50.8 17.1 8.3
 3 1,098,663 77.0 4.3 13.9 4.7
District Total White Black Hispanic Other
 4 1,081,089 67.5 4.4 19.7 8.4
 5 1,088,388 69.8 6.2 18.1 5.9
 TOTAL 4,897,971 55.8 13.4 23.3 7.5
 Findings and Order Regarding Remedial Redistricting Plan and Election Schedule 4 (filed Aug. 6, 1990).
 
 
 [3]
 This language is also quoted in Gaffney v. Cummings, 412 U.S. 735, 744, 93 S.Ct. 2321, 2327, 37 L.Ed.2d 298 (1973)
 
 
 [4]
 This language is also quoted in Moore v. Ogilvie, 394 U.S. 814, 817, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969), and Reynolds, 377 U.S. at 557-58, 84 S.Ct. at 1379
 
 
 [5]
 It is established, of course, that an elected official represents all persons residing within his district, whether or not they are eligible to vote and whether or not they voted for the official in the preceding election. See Davis v. Bandemer, 478 U.S. 109, 132, 106 S.Ct. 2797, 2810, 92 L.Ed.2d 85 (1986) (plurality)
 
 
 [6]
 This language is also quoted in Whitcomb v. Chavis, 403 U.S. 124, 141, 91 S.Ct. 1858, 1868, 29 L.Ed.2d 363 (1971)
 
 
 [7]
 The Court has continued to justify the requirement of equality of populations as a means of assuring that "each citizen's portion [is] equal." Morris, 109 S.Ct. at 1438; see also Lockport v. Citizens for Community Action, 430 U.S. 259, 264, 97 S.Ct. 1047, 1051, 51 L.Ed.2d 313 (1977) ("[I]t has been established that the Equal Protection Clause cannot tolerate the disparity in individual voting strength that results when elected officials represent districts of unequal population....")
 
 
 [8]
 In Burns, the ninth and tenth districts contained 28% of Oahu's total population, yet were entitled to only 6 representatives. The fifteenth and sixteenth districts, on the other hand, contained only 21% of the population, but were entitled to 10 representatives. Burns, 384 U.S. at 90-91 & n. 18, 86 S.Ct. at 1295 & n. 18. Thus, in districts 9 and 10, there was one representative for every 4.67% of Oahu's total population, whereas in districts 15 and 16, there was one representative for every 2.1% of the population. This deviation of well over 100%--122%, in fact--far exceeds the population deviations held permissible by the Supreme Court in the line of cases discussed below. See pp. 785-786 infra
 
 
 [9]
 One's resolve in this regard is put to the test by Brown v. Thomson, 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983). See id. at 850, 103 S.Ct. at 2700 (Brennan, J., dissenting); note 11 infra
 
 
 [10]
 My colleagues also rely on the fact that apportionment for the House of Representatives is based on whole population figures. But for reasons explained by the Supreme Court in Reynolds, 377 U.S. at 571-77, 84 S.Ct. at 1386-89, arguments based on the "federal analogy" are "inapposite and irrelevant to state legislative redistricting schemes," id. at 573, 84 S.Ct. at 1387, and therefore are not particularly persuasive in the context of state and local apportionment cases. Congressional apportionments are governed by section 2 of the fourteenth amendment, which makes total population the apportionment base; it says nothing about state apportionments. If this provision were meant to govern state legislative apportionments, the principle of one person one vote, based on a separate part of the fourteenth amendment, would be superfluous
 
 
 [11]
 The only contrary authority seems to be Brown v. Thomson, as to which it is not clear at all what the relevant deviation was. The only deviation mentioned by the majority and concurring opinions is 89%, which was the degree of deviation of one particularly small county. But the majority and concurrence go to great lengths to assure us that that is not the relevant figure; the two concurring Justices expressed "the gravest doubts that a statewide legislative plan with an 89% maximum deviation could survive constitutional scrutiny...." 462 U.S. at 850, 103 S.Ct. at 2700 (O'Connor, J., joined by Stevens, J., concurring). Because of the peculiar procedural posture of the case, it is hard to tell just what the court viewed as the relevant deviation; it might have been 23%, see id. at 860 n. 6, 103 S.Ct. at 2705 n. 6 (Brennan, J., dissenting), although, for the reasons explained by the dissent, this figure, like the theory of the majority, seems to make little sense
 
 
 [12]
 The Court has been somewhat vague as to what interests justify departure beyond the 10% de minimis buffer, but the only one clearly identified has been a long-standing and genuine desire to maintain the integrity of political subdivisions. Reynolds, 377 U.S. at 578-81, 84 S.Ct. at 1390-91; Abate, 403 U.S. at 183, 187, 91 S.Ct. at 1905, 1908
 
 
 [13]
 See, e.g., Suro, Behind the Census Numbers, N.Y. Times, Sept. 16, 1990, Sec. 4, at 4 col. 1