TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

| | | |
|---|---|---|
| OPINION | : | No. 91-403 |
| of | : | |
| | : | August 9, 1991 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| RODNEY O. LILYQUIST | : | |
| Deputy Attorney General | : | |
| | : | |

THE HONORABLE PETE WILSON, GOVERNOR OF CALIFORNIA, has requested an opinion on the following questions:

1. Under section 2 of the Voting Rights Act, does the creation of "majority-minority" districts in a redistricting plan take precedence over all other criteria (including preservation of incumbencies) used to draw district boundaries except for the "one person, one vote" requirement?

2. If a district can be created with a racial minority population high enough to guarantee the election of a candidate of the racial minority community's choosing, does section 2 of the Voting Rights Act require the creation of such a district in a redistricting plan?

3. Do section 2 of the Voting Rights Act and the California Constitution require that geographically compact racial minority communities of interest not be divided in a redistricting plan?

4. Under what criteria must a redistricting plan be drawn to comply with the standards on political gerrymandering set forth in *Davis v. Bandemer* (1986) 478 U.S. 109?

5. To what extent does the California Constitution impose requirements or limitations on the drawing of district boundaries in addition to those of federal law?

CONCLUSIONS

1. Under section 2 of the Voting Rights Act, the creation of "majority-minority" districts in a redistricting plan, for the purpose of preventing minority vote dilution, takes precedence over all other criteria used to draw district boundaries except for the "one person, one vote" requirement.

2.     If a district can be created with a racial minority population high enough to guarantee the election of a candidate of the racial minority community's choosing, section 2 of the Voting Rights Act generally requires the creation of such a district in a redistricting plan.

3.     Depending upon the totality of the circumstances, section 2 of the Voting Rights Act and the California Constitution generally require that geographically compact racial minority communities of interest not be divided in a redistricting plan.

4.     Under the standards articulated in *Davis v. Bandemer* (1986) 478 U.S. 109, a redistricting plan will be invalidated pursuant to constitutional equal protection guarantees, on the ground of political gerrymandering, only if the plan is intentionally discriminatory and imposes an actual discriminatory effect.

5.     The California Constitution imposes requirements or limitations on the drawing of district boundaries in addition to those of federal law to the extent of requiring timely adjustment of district lines, single-member districts, contiguity of districts, consecutive numbering of districts from north to south, and the geographical integrity of cities, counties and geographical regions to the extent possible.

ANALYSIS

The five questions presented for resolution concern the Senate, Assembly, Board of Equalization, and Congressional elections scheduled for 1992.  Section 1 of article XXI of the California Constitution states:

"In the year following the year in which the national census is taken under the direction of Congress at the beginning of each decade, the Legislature shall adjust the boundary lines of the Senatorial, Assembly, Congressional, and Board of Equalization districts in conformance with the following standards:

"(a) Each member of the Senate, Assembly, Congress, and the Board of Equalization shall be elected from a single-member district.

"(b) The population of all districts of a particular type shall be reasonably equal.

"(c) Every district shall be contiguous.

"(d) Districts of each type shall be numbered consecutively commencing at the northern boundary of the state and ending at the southern boundary.

"(e) The geographical integrity of any city, county, or city and county, or of any geographical region shall be respected to the extent possible without violating the requirements of any other subdivision of this section."

Accordingly, based upon the 1990 federal census, the Legislature has the constitutional duty to adjust the boundaries for Senate, Assembly, Board of Equalization, and Congressional districts during 1991 for the 1992 primary and general elections. (See *Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 672.)  The primary election for these offices will take place on June 2, 1992. (See Elec. Code, § 2551.)

The questions posed not only concern provisions of the California Constitution but also provisions of the federal Voting Rights Act. Section 2 of the Voting Rights Act of 1965, as amended in 1982 (codified at 42 U.S.C. § 1973; hereafter sometimes "section 2") now contains the principal mandate of the Voting Rights Act. It states:

"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

"(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."[1]

With this constitutional and statutory background in mind, we turn to the individual questions presented.

1.  Criteria for Creating District Boundaries

The first question presented is whether the creation of a "majority-minority" district (one in which a racial or language minority group constitutes a majority of the population) takes precedence under section 2 of the Voting Rights Act over all other criteria, including preservation of incumbencies, used to draw district boundaries, except for the "one person, one vote" requirement. We conclude that the creation of majority-minority districts in order to prevent minority vote dilution takes precedence over all other criteria used to draw district boundaries, except for the "one person, one vote" requirement; preservation of incumbency, while not necessarily impermissible as a basis for redistricting (see *Davis v. Bandemer* (1986) 478 U.S. 109, 128-129, plur. opn. of White, J.), is not a criterion recognized or mandated by either federal or state constitutional or statutory law.

Preliminarily, we note the requirement of the equal protection clause of the United States Constitution with respect to the principle of "one person, one vote." Since *Baker v. Carr* (1962) 369 U.S. 186, the United States Supreme Court has developed and enforced the "one person, one vote" principle in the legislative districting context regarding inequalities in population between districts. The size of state legislative districts must be "as nearly of equal population as is practical."

---

[1] "[T]he guarantees set forth in section 1973b(f)(2)" are as follows:

"No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group."

(*Reynolds v. Sims* (1964) 377 U.S. 533, 577.)  Congressional districts must represent populations that are "as mathematically equal as reasonably practical." (*Kirkpatrick v. Preisler* (1969) 394 U.S. 526, 531.)

Besides the standards specified in article XXI of the California Constitution, various criteria have been established for drawing district boundaries, including "(a) topography, (b) geography, (c) cohesiveness, and contiguity, integrity, and compactness of territory, and (d) community of interests" (Elec. Code, §§ 35000, 35101) and "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbents" (*Karcher v. Daggett* (1983) 462 U.S. 725, 740).  (See also Grofman, *Criteria for Districting: A Social Science Perspective* (1985) 33 UCLA L.Rev. 77, 79-88 (hereafter "*Criteria*") [equal population, contiguity, compact districts, districts following local political subunit boundaries and other "natural" demarcation lines, preserving communities of interest, and coterminality of house and senate plans].)

In relation to the primary consideration of population equality (the one person, one vote principle), the other criteria are secondary.  (See *Karcher v. Daggett, supra*, 462 U.S. 725, 739; *Chapman v. Meier* (1975) 420 U.S. 1, 23.)  Under section 2 of the Voting Rights Act, do these other criteria also defer to the creation of a district in which a racial or language minority group would constitute a majority?

In *Thornburg v. Gingles* (1986) 478 U.S. 30, the United States Supreme Court examined section 2 and its legislative history.  (*Id.,* at pp. 43-46.)  It found that in 1982 Congress amended section 2 to eliminate requiring any "proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters." (*Id.*, at p. 44.)  Instead, Congress fashioned a "results test" based upon various "factors" and the "totality of the circumstances" to determine whether "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." (*Id.,* at p. 47; see *White v. Regester* (1973) 412 U.S. 755, 764; Abrams, "*Raising Politics Up*": *Minority Political Participation and Section 2 of the Voting Rights Act* (1988) 63 N.Y.U. L.Rev. 449, 450-451 (hereafter *Political Participation*); *Criteria, supra,* at p. 98.)  As expressed in the Senate Report that accompanied the 1982 amendment, "[T]he provision requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority votes is, in the language of *Fortson* and *Burns*, `minimized or cancelled out.'" (Sen.Rep. No. 97-417, 2d Sess., at p. 29, n. 118 (1982) (hereafter, "Sen.Rep.").)[2]

While precise standards for maintaining a section 2 claim with respect to single-member district plans have not been established by the courts, we believe three "preconditions" based upon the "results tests" are necessary for such claims.  These preconditions are:  (1) geographical compactness of the minority group, (2) minority political cohesion, and (3) racially polarized bloc voting.[3] (See *Thornburg v. Gingles, supra,* 478 U.S. at 50-51; *Garza v. County of Los Angeles* (9th Cir. 1990) 918 F.2d 763, 770-771, cert. denied, 111 S.Ct. 681 (1991); see also, e.g., *Chisom v. Roemer* (1991) ____ U.S. ____, 59 U.S.L.W. 4696, 4700; *Solomon v. Liberty County, Fla.* (11th Cir. 1988) 865 F.2d 1566, 1571; *Un. Latin Amer. Cit. v. Midland Ind. Sch. Dist.* (5th Cir.

_____

[2]"*Fortson*" refers to *Fortson v. Dorsey* (1965) 379 U.S. 433, and "*Burns*" refers to *Burns v. Richardson* (1966) 384 U.S. 73.

[3]"`Racial polarization' exists where there is a consistent relationship between [the] race of the voter and the way in which the voter votes." (*Thornburg v. Gingles, supra,* 478 U.S. 30, 53, n. 21.)

1987) 812 F.2d 1494, 1496-1498; *Political Participation, supra*, at pp. 465-468.) For purposes of the question presented, we assume that a redistricting authority has identified minority communities exhibiting these characteristics and would, therefore, create majority-minority districts for the purpose of avoiding violation of section 2 of the Voting Rights Act. Where section 2 has been violated, or where the section otherwise would be violated, creation of a majority-minority district is mandated. (See *Garza v. Los Angeles County, supra*, 918 F.2d 763, 776 ["The deliberate construction of minority controlled voting districts is exactly what the Voting Rights Act authorizes"].)

It is important to note that under the "results test," Congress did not intend to create a new test for assessing violations of section 2, but intended rather to codify the test articulated by Justice White in his opinion in *White v. Regester, supra*, 412 U.S. 755. (See Boyd & Markham, *The 1982 Amendments to The Voting Rights Act: A Legislative History* (1983) 40 Wash. & Lee L. Rev. 1313, 1417 (hereafter *Legislative History*), quoting Senator Dole; Sen.Rep., *supra*, at pp. 2, 27-28, 32, 194; *Chisom v. Roemer, supra*, 59 U.S.L.W. at 4700.)

Debate in the Senate focused largely on the question whether sections 2's "results test" could be construed as a mandate for proportional representation. The Senate Report rejected this concern as unfounded, citing prior judicial applications of the "results test" that upheld multi-member districts where the totality of the circumstances did not otherwise indicate a denial or abridgment of the right to vote. (Sen.Rep., *supra*, at p. 33.) Senator Dole commented: "The focus of the standard is on whether there is equal access to the political process, not on whether members of a particular minority group have achieved proportional elections results." (Sen.Rep., *supra*, at p. 294.)

We do not believe that section 2 mandates creation of majority-minority districts merely on a *presumption* of racially polarized voting. "[T]he results test *makes no assumptions one way or the other* about the role of racial political considerations in a particular community. (See e.g., *Clinton v. Jeffers* (E.D. Ark. 1989) 730 F.Supp. 196, 216-217, affd. 111 S.Ct. 662.) If plaintiffs assert that they are denied fair access to the political process, in part, because of the racial bloc voting context within which the challenged election system works, they would have to prove it." (Sen.Rep., *supra*, at p. 34 (emphasis in original); see also, *Thornburg v. Gingles, supra* 478 U.S. 30, 46.)

We do not question that race-conscious redistricting is permissible as a *remedy* for violation of section 2. (See *Garza v. County of Los Angeles, supra*, 918 F.2d 763, 776.) Nor do we question that race-conscious redistricting may be required to *prevent* a violation of section 2, considering the totality of the circumstances. However, in light of the legislative history and decisions construing section 2, we conclude that section 2 of the Voting Rights Act does not *categorically* make creation of majority-minority districts the preeminent concern of legislative district drawing absent other important conditions.

Cases brought under section 2 should not be confused with the pre-clearance requirements found in *section 5* of the Voting Rights Act (42 U.S.C. § 1973c), where the creation of majority-minority districts *in covered jurisdictions*[4] may take precedence over all other criteria used to draw district boundaries, except for the "one person, one vote" requirement. Section 5 imposes on covered jurisdictions the burden of proving -- either to the federal district court for the District of Columbia, or to the United States Attorney General -- that a new "qualification,

---

[4] Four California counties are "covered" under section 5 of the Voting Rights Act: Yuba, Monterey, Kings, and Merced. (28 C.F.R. part 51, Appendix, p. 582 (1991).)

prerequisite, standard, practice, or procedure [with respect to voting] does not have the purpose *and will not have the effect of* denying or abridging the right to vote on account of race or color or [membership in a language minority group]."  (42 U.S.C. § 1973c (emphasis added).)

The "effects test" of section 5 is not the same as the "results test" of section 2.  The Senate Report states:  "By referring to the `results' of a challenged practice and by explicitly codifying the *White* standard, the amendment distinguishes the standard for proving a violation under Section 2 from the standard for determining whether a proposed change has a discriminatory `effect' under Section 5 of the Act."  (Sen.Rep., *supra*, at p. 68.)  The Senate Report notes specifically that, "Plaintiffs could not establish a *Section 2* violation merely by showing that a challenged reapportionment or annexation, for example, involved a retrogressive effect on the political strength of a minority group."  (*Id.,* at p. 68,  n. 264 (emphasis added).)

In deciding whether to "clear" a districting plan for implementation, the Attorney General will consider, among other things, whether the change in districting will "make members of [the protected] group worse off than they had been before the change" (28 C.F.R. § 51.54(a) (1991)); "[t]he extent to which minority voting strength is reduced by the proposed redistricting" (28 C.F.R. § 51.59(b) (1991)); and [t]he extent to which minority concentrations are fragmented among different districts" (28 C.F.R. § 51.59(c) (1991)).  Creation of majority-minority districts in covered jurisdictions is certainly one way of ensuring preclearance (see, e.g., *United Jewish Organizations et al.* v. *Carey* (1977) 430 U.S. 144), and, by virtue of the supremacy clause of the United States Constitution (U.S. Const., art. VI, § 2), satisfaction of section 5 preclearance requirements (42 U.S.C. § 1973c) would take precedence over any other criteria in the drawing of district lines, save for the "one person, one vote" requirement of the equal protection clause.

Returning, then, to the particular question under consideration, we believe that *Carstens v. Lamm* (D.Colo. 1982) 543 F.Supp. 68, provides the correct approach in setting forth the hierarchy of criteria for drawing district boundaries.  The one person, one vote principle is "`pre-eminent,'" followed by the "second constitutional criteria" of protecting minority rights against "invidious racial discrimination," followed by a third group of criteria such as "(1) compactness and contiguity; (2) preservation of county and municipal boundaries, and (3) preservation of communities of interest." (*Id.*, at pp. 81-82.)  The Voting Rights Act arises out of the Constitution's express vesting of power in Congress to enforce the guarantees of the Fifteenth Amendment.  (U.S. Const., Amend. XV, § 2; see *South Carolina v. Katzenbach* (1966) 383 U.S. 301, 324 [Congress has full remedial powers to effectuate the constitutional prohibition against racial discrimination in voting].)  The third group of criteria is not based in the federal Constitution.  (See *Gaffney v. Cummins* (1973) 412 U.S. 735, 752, n. 18 ["Compactness ... has never been held to constitute an independent federal constitutional requirement for state legislative districts"]).  By virtue of the Constitutions' "supremacy clauses" (U.S. Const., art. VI, § 2; Cal. Const., art. III, § 1), compliance with section 2 takes precedence over all conflicting state constitutional or statutory requirements.

In answer to the first question, therefore, we conclude that, where necessary to prevent minority vote dilution, considering the totality of the circumstances, the creation of majority-minority districts takes precedence over all other criteria used to draw district boundaries except for the one person, one vote requirement.

2.      Creating Majority-Minority Districts

The second question posed is whether section 2 of the Voting Rights Act requires the creation of a district with a racial minority population high enough to guarantee the election of a candidate of the racial minority community's choosing, if such a district can be created.  We conclude that it generally does.

In *Garza v. County of Los Angeles, supra,* 918 F.2d 763, the Ninth Circuit found that "[t]o the extent that a redistricting plan deliberately minimizes minority political power, it may violate both the Voting Rights Act and the Equal Protection Clause of the fourteenth amendment." (*Id.,* at p. 766.) As previously indicated, the court expressly held that "[t]he deliberate construction of minority controlled voting districts is exactly what the Voting Rights Act authorizes." (*Id.*, at p. 776.)

We are presented with the possible creation of a district with a high enough minority population so as to *guarantee*[5] the election of the minority community's candidate of choice. If the minority community is instead fragmented into two or more districts, the redistricting plan will be subject to a claim under *Garza*[6] that it "deliberately minimizes minority political power" in violation of section 2. In *Gaffney v. Cummins, supra,* 412 U.S. 735, 753, the Supreme Court observed in an analogous situation that "it is most unlikely that the political impacts of such a plan would remain undiscovered by the time it was proposed or adopted, in which event the results would be known and, if not changed, intended." Moreover, as already noted, the 1982 amendment of section 2 eliminated the intent requirement and added the totality of circumstances test in determining whether minority "members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

As always, then, it is the totality of the circumstances which must be considered in deciding whether any districting arrangement violates section 2. (Cf., *Whitcomb v. Chavis* (1971) 403 U.S. 124, 149-153.) Among the factors which the United States Attorney General would consider in connection with a *section 5 preclearance* of a redistricting plan is, "whether the change [affecting voting] is free of discriminatory purpose and retrogressive effect" and "[t]he extent to which minority concentrations are fragmented among different districts." (28 C.F.R. §§ 51.55, 51.59 (1991).) We believe that these factors could also be properly included among the "totality of circumstances" considered for the purposes of assessing a violation of *section 2*.

In answer to the second question, therefore, we conclude that if a district can be created with a racial minority population high enough to guarantee the election of a candidate of the racial minority community's choosing, section 2 of the Voting Rights Act generally requires the creation of such a district.

### 3.    Dividing Minority Communities of Interest

The third question presented is whether section 2 of the Voting Rights Act and the California Constitution require that geographically compact racial minority communities of interest (not sufficiently large enough to constitute a majority in any configured district) not be divided when drawing district boundaries. By the phrase, "geographically compact racial minority community of interest," we assume that a politically cohesive minority community and the existence of racially polarized voting is meant. With these assumptions in mind, we conclude that such communities generally must not be fragmented.

---

[5]We assume that use of the word "guarantee" is a shorthand way of incorporating the three *Gingles* criteria (geographical compactness, minority political cohesion, and racial bloc voting) into the question posed.

[6]*Thornburg v. Gingles, supra*, 473 U.S. 30, expressly did not address "a claim alleging that the splitting of a large and geographically cohesive minority between two or more ... single-member districts resulted in the dilution of the minority vote." (*Id.*, at p. 46, fn. 12.)

In *Thornburg v. Gingles, supra*, 478 U.S. 30, the court expressly did not consider "[w]hat standards should pertain to a claim brought by a minority group that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a voting standard, practice or procedure impairs its ability *to influence* elections." (*Id.*, at p. 46, fn. 12.) However, four concurring justices in *Gingles* noted that the reasoning of the majority could easily support an "ability to influence" claim:

> "But the court recognizes that when the candidates preferred by a minority group are elected in a multimember district, the minority group has <u>elected</u> those candidates, even if white support was indispensable to these victories. On the same reasoning, if a minority group that is not large enough to constitute a voting majority in a single-member district can show that white support would probably be forthcoming in some such district to an extent that would enable the election of the candidates its members prefer, that minority group would appear to have demonstrated that, at least under this measure of its voting strength, it would be able to elect some candidates of its choice." (*Id.* at p. 90, n. 1 (conc. opn. of O'Connor, J.).)

In *Garza v. County of Los Angeles, supra*, 918 F.2d 763, the lower court was initially presented with a redistricting plan in which a minority community of interest was geographically compact but less than a majority of the population in any district. The plan was rejected by the lower court because it "resulted in dilution of Hispanic voting power in violation of section 2" and it "intentionally discriminated against Hispanics in violation of Section 2 ...." (*Id.,* at p. 769.) The Ninth Circuit upheld the lower court's second alternative theory of liability, stating:

> "We hold that, to the extent that *Gingles* does require a majority showing, it does so only in a case where there has been no proof of intentional dilution of minority voting strength. We affirm the district court on the basis of its holding that the County engaged in intentional discrimination at the time the challenged districts were drawn." (*Ibid.*)

Accordingly, a geographically compact racial minority community of interest may not be divided if the division constitutes an *intentional* dilution of minority voting strength.[7]

While the issue is not free from doubt, we believe the better approach is to rely on the "results test" fashioned by Congress in 1982 to determine whether a geographically compact racial minority community of interest may be divided based upon an examination of the totality of circumstances. Generally the answer will be "no." (See *Carstens v. Lamm, supra*, 543 F.Supp. 68, 81-82 ["redistricting plans ... should not fracture a natural racial or ethnic community or otherwise dilute minority voting strength"]; *Goddard v. Babbitt* (D.Ariz. 1982) 536 F.Supp. 538, 541 [division of a small Apache Indian tribe among three congressional districts criticized for having "the effect of diluting the San Carlos Apache Tribal voting strength and dividing the Apache community of interest"].)

Section 2 is clearly intended to secure fair access to the political process, unimpaired because of race, color, or membership in a minority language group. While mere numerical inability

---

[7]With complete reporting of population data, including racial data and voting age information, contained in the federal census for local geographic units, it would be virtually impossible to claim that fragmenting a minority community was not "intentional," although possibly not intentionally discriminatory. (See *Gaffney v. Cummins*, *supra*, 412 U.S. 735, 753.)

to elect a representative may not, standing alone, establish a violation of section 2, that fact should not render the minority group wholly unprotected under section 2, if the community is otherwise politically cohesive and there is evidence of majority racial bloc voting. We believe that where voting is racially polarized, it is especially important that the ability of politically cohesive minority groups to *influence* the political process not be diminished.

The California Constitution is consistent with this analysis of the Voting Rights Act. "The geographical integrity of any city, county, or city and county, or of any geographical region shall be respected to the extent possible without violating the requirements of any other subdivision of this section." (Cal. Const., art. XXI, § 1, subd. (e).) The apparent purpose of protecting the integrity of a geographical region is to respect and foster the common interests of those persons residing in the region.[8] However, by its own terms, the California Constitution cannot be said to "require" the keeping together of racial minority communities of interest, since it only refers to respecting the integrity of geographical regions "to the extent possible."

Of course, a geographically compact minority community of interest may be so large that splitting it would create two or more districts, each having a majority of the population. (See *Clinton v. Jeffers*, *supra*, 730 F.Supp. 196 [redistricting plan violated the Voting Rights Act by creating only 5 black majority districts since 16 such districts were possible].) On the other hand, a geographically compact minority community of interest may be so small that it has no possibility of influencing any elections.[9]

We conclude, therefore, in answer to the third question that depending upon the totality of circumstances, section 2 of the Voting Rights Act and the California Constitution generally require geographically compact minority communities of interest not be divided in drawing district boundaries.

4. Political Gerrymandering Under Federal Law

The fourth question concerns the practice of political gerrymandering in the drawing of district boundaries. Under what conditions may political considerations, such as preserving incumbencies, be consistent with the equal protection clause of the United States Constitution in the drawing of district boundaries under the standards set forth in *Davis v. Bandemer, supra,* 478 U.S. 109?

The plaintiffs' claim in *Bandemer* was that "each political group in a State should have the same chance to elect representatives of its choice as any other political group." *(Id.*, at p. 124.) In response to this claim, a plurality of the court[10] reasoned that a redistricting plan would

---

[8]In 1980, the ballot argument in favor of Proposition 6 (adding article XXI to the California Constitution) explained that section 1, subdivision (e) would "help protect minority communities from being carved up just to dilute their votes."

[9]However, the San Carlos Apache Tribe that was required to be placed in a single district in *Goddard v. Babbitt, supra,* 536 F.Supp. 538, constituted only 1.47 percent of an "ideal" congressional district. (*Id.*, at p. 540.)

[10] The case produced four opinions. A majority of six justices, led by Justice White, held that political gerrymandering is justiciable. A plurality of four justices, still led by Justice White, concluded that the Indiana gerrymander itself did not violate the Equal Protection Clause. Justices Powell and Stevens dissented on this latter point, on the grounds that the Indiana plan should be held

survive a constitutional challenge based on asserted "political gerrymandering" unless the plan were proved to be both *intentionally* discriminatory and *actually* discriminatory in its effect. (*Id.* at p. 127.) As respects the first part of the test, the plurality conceded that, "[a]s long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." (*Id.* at p. 129.) Therefore, under the *Bandemer* plurality, if such a redistricting plan is shown to be intentionally discriminatory on a partisan basis, the plan cannot survive if it has an actual discriminatory effect.

The plurality in *Bandemer* offered some broad descriptions of situations which might render an apportionment scheme constitutionally infirm:

> "[U]nconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or group of voters' influence on the political process as a whole. [¶] ... [T]he question is whether a particular group has been unconstitutionally denied its chance to effectively influence the political process. ... [A]n equal protection violation may be found only where the electoral system substantially disadvantages certain voters in their opportunity to influence the political process effectively. In this context, such a finding of unconstitutionality must be supported by evidence of continued frustration of the will of a majority of the voters or effective denial to a minority of the voters of a fair chance to influence the political process." (*Id.* at pp. 132-133.)

We find it difficult to distill from *Bandemer* any discrete criteria which *must* be met in order to satisfy implied constitutional limitations on political gerrymandering. However, we do note that the plurality did not reject Justice Powell's "factors" as totally irrelevant. The plurality conceded that "evidence of exclusive legislative process and deliberate drawing of district lines in accordance with accepted gerrymandering principles would be relevant to intent, and evidence of valid and invalid configuration would be relevant to whether the districting plan met legitimate state interests." (*Id.* at p. 141.) Thus, any criteria which depart from those contained in the California Constitution, which are presumably expressions of valid state interests, would be closely examined. As mentioned earlier in our response to the first question, preservation of incumbencies[11] is not a criterion recognized or mandated by either federal or state constitutional or statutory law.

In answer to the fourth question, therefore, we conclude that a redistricting plan will be invalidated pursuant to constitutional equal protection guarantees, on the ground of political gerrymandering, only if the plan is intentionally discriminatory and imposes an actual discriminatory effect.

### 5. California Constitutional Requirements

The fifth question presents the issue of the extent to which the California Constitution imposes requirements or limitations on the drawing of district boundaries in addition to those of federal law. We conclude that timely adjustment of district lines, single-member districts, contiguity, consecutive numbering of districts from north to south, and preserving geographical

---

unconstitutional. A minority of three Justices, Chief Justice Burger and Justices Rehnquist and O'Conner, insisted that political gerrymandering should not be justiciable at all.

[11]According to Bernard Grofman, an expert for the State of Indiana in *Bandemer*, "displacing incumbents of the *opposing* party is, perhaps, the most important single tactic of contemporary sophisticated gerrymandering." (*Criteria, supra,* at pp. 115-116.)

integrity of any city, county, or city and county, or of any geographical region are additional requirements under the California Constitution.

Multi-member districts and at-large voting procedures are not "preferred" but are allowable under federal law if they comply with the "results test" of section 2 of the Voting Rights Act as described in *Thornburg v. Gingles, supra*, 478 U.S. 30, 46-51. (See also *Rogers v. Lodge* (1982) 458 U.S. 613, 617; *White v. Regester, supra*, 412 U.S. 755, 765-766; *Chapman v. Meier, supra*, 420 U.S. 1, 18-19; *Connor v. Johnson* (1971) 402 U.S. 690, 692.) The California Constitution, on the other hand, requires that "[e]ach member of the Senate, Assembly, Congress, and the Board of Equalization shall be elected from a single-member district." (Cal. Const., art. XXI, § 1, subd. (a); see art. IV, § 6; art XIII, § 17.)

The California Constitution mandates that "the Legislature *shall* adjust boundary lines" for Senate, Assembly, Congressional and Board of Equalization districts *in the year after the national census is taken* at the beginning of each decade. (Cal. Const., art. XXI, § 1, emphasis added.) Given California's tremendous growth over the past decade, particularly in minority populations, lack of timely compliance with this mandate could well result in maladjusted districts violating the federal Voting Rights Act and the "equal population" requirement in subdivision (b) of section 1, article XXI of the state Constitution.

The California Constitution also imposes the conditions that "[e]very district shall be contiguous," "[d]istricts of each type shall be numbered consecutively commencing at the northern boundary of the state and ending at the southern boundary," and "[t]he geographical integrity of any city, county, or city and county, or any geographical region shall be respected to the extent possible without violating the requirements of any other subdivision of this section." (Cal. Const., art. XXI, § 1, subds. (c), (d) & (e).) These conditions do not exist under federal law.

In answer to the fifth question, therefore, we conclude that the California Constitution imposes requirements or limitations upon the drawing of district boundaries in addition to those of federal law by requiring timely adjustment of district lines in the year after the national census, single-member districts, contiguity, consecutive numbering of districts from north to south, and geographical integrity of cities and counties and geographical regions to the extent possible.

* * * * *

11.                                                                                          91-403